## State of Vermont v. Leonard L. Pease

[271 A.2d 835]

No. 2-69

Present: **Holden, C.J., Shangraw, Barney, Smith and Keyser, JJ.**

Opinion Filed December 9, 1970

*James M. Jeffords,* Attorney General, *H. Russell Morss, Jr.,* and *Martin K. Miller,* Assistant Attorneys General, for the State.

*Peter P. Plante,* White River Junction, for Defendant.

**Barney, J.** According to the evidence, shortly after shooting his wife, the respondent made an attempt to inform the authorities of his act. Mrs. Rydjeski, wife of a state police officer, was the startled recipient of telephoned word from the respondent of what he had done. This news she relayed to her husband and headquarters. The call came to her about 11:10 P.M. Her husband arrived at the scene of the homicide between 11:30 and 11:45 P.M. The respondent himself fixed the time of the crime at 10:45 P.M.

After investigation a presentment was made to the grand jury and an indictment for first degree murder returned. The respondent pleaded not guilty. During the course of preparation the respondent, on several occasions, through his counsel, availed himself of his right to depose witnesses for the state under 13 V.S.A. § 6721. There is some controversy about whether or not this right was at all restricted in its exercise by the court. The transcript of the hearing on the motion to take depositions clearly left it to the respondent to make further application if depositions of witnesses other than those listed in the order made at that hearing were needed. This was acceptable to respondent's counsel. It was acknowledged on oral argument that the exception argued presupposed a denial, and if the transcript later supplied showed otherwise, the respondent had no basis for complaint. As indicated, the transcript clearly shows the court was prepared to enlarge the order if, on further investigation counsel for the

respondent was convinced additional depositions were necessary. With no subsequent request there is no error in this particular. The orders issued by the court, authorizing depositions to be taken by the respondent, did cover all witnesses who, in fact, testified at the trial.

Trial by jury was had and resulted in a verdict of guilty as charged in the indictment. The respondent presented no witnesses and did not testify, resting his case at the close of the state's evidence.

The two principal points argued on this appeal both related to the claimed intoxicated state of the respondent at the time of the crime and the time of his interrogation. To pass upon these issues, the factual situation, as rendered by the record, is important. When the trooper had the news from his wife relayed to him, he was at a diner, and he called the Pease residence. The person who answered the phone identified himself as Leonard Pease. The trooper asked him what the trouble was and the respondent replied that, he had killed his wife. The trooper immediately proceeded to the respondent's house and, on arrival, was admitted by him. The officer asked, "Where is she," and the respondent gestured toward the next room. When the officer found her slumped in her chair, he could discover no pulse, but the body was still warm. The respondent then stated that he had killed her, and that the gun was on the stairway. Thereupon the trooper told him not to say any more and advised him of his constitutional rights. The respondent insisted that as a former military policeman and as a reader of news magazines he knew his rights, and did not want a lawyer. He said that he knew he didn't have to talk about the shooting if he didn't want to, and he knew he shouldn't have done it, but he did. He pointed out the revolver used, which was in its holster on the stairway in the room where the shooting took place.

The trooper arrived at the house about 11:30 P.M., March 10, 1967. The medical examiner, the state's attorney and various other law enforcement officials arrived on the scene from time to time until, at 4:50 A.M. on the 11th of March, the respondent was formally arrested, the warrant read to him, and he was taken to Woodstock to jail. These witnesses quite consistently reported that the respondent was very talkative, and, that there was some odor of intoxicants

about him, but that he appeared quite rational and fully comprehended the proceedings going on, at times lending advice or assistance. He had no difficulty maneuvering, was not unsteady on his feet, but smoked and talked incessantly. At the time he admitted the trooper by unlocking the door he was dressed only in two-piece long winter underwear and socks and was unshaven. The house was extremely warm and he remained in that costume until he got dressed to go to Woodstock after arrest under a warrant about five o'clock in the morning.

The medical examiner took a blood sample from him and found a blood alcohol content of .187. The evidence of this doctor and of the state pathologist was that this represented being under the influence of intoxicants. The medical examiner, who observed him and talked with him, indicated that the respondent fully understood what had happened and what was going on, even though he was talkative.

The examiner indicated that the degree of the respondent's intoxication could not be determined from his blood alcohol level because "some people have a much greater tolerance than other people . . . ." He did agree that the blood alcohol level was high enough to have an affect on the ability of the respondent to make a rational judgment.

The state pathologist, who was not at the scene of the crime, testified generally about the effect of the consumption of alcohol. He agreed that consumption of alcoholic beverages diminishes the ability to make a rational judgment, and that a person with a .187 blood count would not be able to think as clearly as he would in a normal state. The judgment functions would probably be impaired at that level. He also referred to the tolerance built up by persons used to taking alcohol. He said, "A person with that level, if he were at all an experienced drinker, could do almost anything they normally would be able to do without drinking. It still doesn't alter the fact they would be impaired but it might not be noticed." There were other statements to this same general effect.

The first officer on the scene found a beer bottle on the kitchen table and a partial bottle of vodka on the staircase in the living room. The respondent, at some point, told him that he was a heavy drinker and drank a lot. He also acknowledged that he had been drinking that day. He also said that he and Mrs. Pease on occasion got drunk together, and then she would

ask him to shoot her. Apparently he did, on one occasion, shoot behind her "to try to scare her." He stated that this time, when he did shoot her, he was lying on a cot in the living room and she was sitting across from him in a chair. He had to go to the Veterans Administration hospital for treatment and he expressed concern about her ability to carry on without him. Apparently it led to an argument and he shot her from his position prone on the couch.

The information that came from the respondent was, in the main, volunteered, both before and after he was given the *Miranda* warnings. Although he discussed the affair freely, and rejected any suggestion that he consult an attorney, he would not sign any statement. On that account there was no ordered interrogation, as such, but as the investigation went along in the presence of the respondent, he described and explained events and responded to questions.

With respect to this interrogation, the respondent argues that his state of sobriety was such that, although he was adequately informed of his rights, his condition did not permit any waiver of these rights to be effective. The lower court conducted a preliminary hearing on the issue of the admissibility of statements made by the respondent, and found they were voluntarily given with full understanding on the part of the respondent that he was not required to answer questions or say anything, that anything he did say would be available to be used against him, that he was entitled to a lawyer present during any questioning, and that if he couldn't afford one the State would furnish one. These are the so-called *Miranda* warnings in substance as they are set out in *Miranda* v. *Arizona*, 384 U.S. 436, 16 L.Ed.2d 694 (1966). The issue of the respondent's intoxication was not argued to the trial court at the preliminary hearing as affecting the ruling on admissibility.

█ Thus, we are now faced with the proposition that the respondent's condition was such that his waiver was ineffective as a matter of law. To say that would require us to state that the evidence so strongly showed that the mental capacity of the respondent was so overborne by his alcoholic condition at the time of the *Miranda* warning that he could not be conceived to be able to comprehensibly or understandably waive

these rights. A ruling as a matter of law would require the evidence of his lack of capacity to intelligently waive his rights to be of such weight that a contrary finding could not stand. *Grow* v. *Wolcott*, 123 Vt. 490, 494, 194 A.2d 403 (1963). Since this issue was not presented below we have no findings of facts, one way or another, on this issue. Contrary to the usual rule, *State* v. *Hood*, 123 Vt. 273, 278, 187 A.2d 499 (1963), since this is a first degree murder conviction, we have examined in detail the transcript and find no justification for ruling as a matter of law, that the respondent's waiver could not be said to be knowing, knowledgeable and binding.

This issue was raised and submitted to the jury in connection with their evaluation of the admissibility of the statements made by the respondent. The respondent also complains that the charge of the court did not adequately instruct the jury as to the possible affect of intoxication on these admissions and, also, on the subject of the respondent's ability to generate the malice that is an element of first degree murder.

In order that there be no misunderstanding, it must be stated that the concern for the effects of the use of intoxicants with respect to the operation of motor vehicles is different in both kind and quantum from the concerns about mental condition as related to homicide. The slowing or dulling of mental reaction and judgments of speed and distance have critical consequences in the operation, on the highway, of a high-speed, powerful, motor vehicle. Indeed, certain people who do not drink at all are equally unfit to drive, perhaps as a consequence of medication or age or physical condition. Yet these people are not thereby rendered incapable of using the judgment they have in their own affairs, slow as it may be, so long as it is rational. And certainly it cannot be said that they are incapable of malice. The handicapping of the ability to promptly and effectively execute operational maneuvers is the concern of the motor vehicle law. The assignment of responsibility for acts done is our concern here.

The respondent asked for an instruction that acute intoxication negates the capacity to harbor malice. But no reasonable view of the evidence, taken in the light most favorable to the respondent, presents the issue of intoxication to an extent justifiably to be categorized as acute. Therefore, the

request was properly denied. *Whitmore* v. *Mutual Life Insurance Co.*, 122 Vt. 328, 337, 173 A.2d 584 (1961). The questions of the effect of the use of intoxicants, as actually evidenced, on the respondent's judgment and rationality, as to both waiver and malice, were for the jury.

The trial court, by its charge, submitted these questions to the jury, as required. With respect to the so-called confessions or admissions, the judge pointed out that extreme intoxication has an effect on rationality and judgment of a person. He indicated that the jury had to determine whether the accused had intelligently and competently waived his *Miranda* rights so as to make his own statements admissible against him. The charge said that if the jury found the respondent intoxicated they must consider this fact in connection with both the weight and the admissibility of the statements. The jury attention was properly directed to the impact of the use of intoxicants and the condition of the respondent, as it related to the admissibility of his statements.

■■ In the case of *State of Vermont* v. *Barrett,* 128 Vt. 458, 266 A.2d 441 (1970), handed down at the June Term, 1970 this Court had occasion to review the relationship of intoxication to the malice necessary to convict of murder in the first degree. While it is clear that intoxication can be so extreme as to rebut any ability of a respondent to formulate the malice necessary to make a deliberate act of killing reach the level of first degree murder, it should be understood that this is because of his actual, and personal inability, under the circumstances, to achieve the state of mental responsibility under which malice is charged, due to intoxication. That is why, if the malicious intent is already formed before he gets so intoxicated, this malice is operative. The ingestion of alcohol is a voluntary act, as the law sees it, and cannot excuse crime or reduce the degree of homicide where the requisite condition of mental responsibility is present. Certainly, a person who drinks to brace himself for such a monstrous act, or drinks knowing that the effect of the alcohol will predispose him to violence, is engaging in a wilful act for which he must be held responsible and accountable.

■ Reduction in the degree of homicide, based on the effects of intoxication, may be compared to the delusional or

involuntary effects of insanity. This issue is raised by evidence that the effect of the alcohol consumed made the actor irrational, and the homicide is a product of this irrational or, perhaps, delusional state, rather than a knowing, conscious or deliberate act. The essence of this law, within the measure of the evidence in the case, was presented to the jury on the issue of malice. The fact of this matter was for their resolution, and resolved against the respondent. We find no error.

*Judgment affirmed and cause remanded for the imposition of sentence.*

**Mr. Justice Shangraw,** who sat on the hearing of this case, took no part in the decision due to illness.