# State of Vermont v. Robert L. Percy

[612 A.2d 1119]

No. 91-131

Present: **Allen, C.J., Gibson, Dooley and Morse, JJ., and Bryan, Supr. J.,**
**Specially Assigned**

Opinion Filed May 8, 1992

*Jeffrey L. Amestoy*, Attorney General, and *David Tartter*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*E.M. Allen*, Defender General, and *William Nelson*, Appellate Attorney, Montpelier, for Defendant-Appellant.

**Morse, J.** Defendant appeals from jury convictions for sexual assault, kidnapping, carrying a dangerous weapon while committing a felony, and assault and robbery. His defense was insanity, and he challenges the convictions on a multitude of grounds: (1) admission in evidence of prior criminal behavior violated V.R.E. 403, (2) evidence of criminal acts committed in Connecticut was improperly admitted and relied on in sentencing, (3) the jury charge failed to state that kidnapping includes an element of felonious intent, (4) the instruction on reasonable doubt was incomplete, (5) he was denied a speedy trial, (6) imposition of a harsher sentence after appeal and retrial violated his due process rights, (7) too little credit for time served was applied to his sentence, and (8) the court improperly engaged in an ex parte telephone conversation about sentence computation with a corrections department employee. We affirm.

The events leading up to this case began late on the afternoon of Friday, January 16, 1981. Defendant was working at a garage in Stowe while awaiting trial on a charge of sexual assault and kidnapping. A week or two earlier, defendant had told another employee to give him any credit cards inadvertently left behind by customers, despite the garage owner's policy that employees were to place them in a box by the cash register. In that conversation the other employee asked defendant how he thought the pending criminal case would come out. He replied, "It doesn't matter. Friday is going to be my last day."

Between 5:00 and 5:30 p.m., a woman pulled up to the gas pumps at the station. Defendant put gas in her car, and then told her that one of her tires needed air. Although there was a well-lit air pump nearby, defendant told her to pull her car up to an air pump located in a dimly lit area of the station. After she did so, defendant told her he needed to get something inside the station. While he was inside, a friend of the woman's drove into the station and parked his car so that the headlights illuminated her car. Defendant came back out and told the woman that everything was all right, and she drove away.

Then, the victim in this case pulled into the station, and defendant filled her car with gas. After she paid, defendant told

her that a tire was low and directed her to the air pump in the dimly lit area. A few minutes later, defendant jumped into the front passenger seat. When the victim asked if this was a joke and told him to get out, defendant ordered her to "shut up and drive." She at first refused, but when defendant pulled a gun, she obeyed. Following his directions, the victim drove along back roads to an isolated spot where defendant told her to park and then ordered her to take off her clothes. When she refused, he choked her, tied her hands behind her back, covered her eyes and nose with a rag, and sexually assaulted her—threatening to use the gun if she resisted. After the assault, she pleaded with defendant to let her go. He said that if he did, she would report the car missing. He reached back, jiggled a baby seat, and told her to lock the door on the passenger side. He then took the wheel and drove off.

As they travelled, defendant asked the victim her name, where she lived, where she worked, and how old her baby was. He pulled into a rest area off I-89 in Chittenden County, where he lit what appeared to the victim to be a marijuana cigarette and insisted that she smoke it. He also ordered her to take all of the money out of her purse and put it on the dashboard; she complied, and defendant later took the cash, totaling $130.

Defendant drove cautiously and at one point watched a state trooper's car in the side-view mirror. At a closed service station, defendant bought a soda from a vending machine and then traced a route on a New York map that he had brought with him. Before leaving, defendant again ordered the victim to lock her door, and he headed the car south.

After entering Connecticut, defendant stopped and parked, pointed the gun at the victim and again sexually assaulted her. Afterward, he told her to lock her door, but since it was already locked, she reached back and unlocked it. Defendant turned on the dome light to check the door, but did not notice that it was unlocked. As they proceeded south, defendant said they needed gas and drove into a busier area. At about 2:00 a.m., the victim saw a police car near an intersection where defendant had stopped. She opened the door, jumped out, and ran to it. Defendant drove away.

Police set up a roadblock, but defendant succeeded in going around it. Defendant later abandoned the car, but police found

him nearby. During arrest processing, defendant gave his name as "Thomas R. Lindbloom." He had in his wallet an identification card with that name on it as well as a card with his own name, two oil company credit cards issued to customers of the garage where he worked, and $855 in cash.

The following day, defendant offered to help police find the gun, which he had thrown out the car window. As he put it, he didn't want a child "to find it and get hurt." Defendant went with the police and showed them his route after the victim jumped out of the car. The gun was not recovered.

At trial, the principal issue was defendant's sanity. Defendant claimed to be suffering from post-traumatic stress disorder (PTSD) as a result of his experiences in the Vietnam war. Defense experts testified that defendant, who claimed to have amnesia about the events, had experienced an unconscious flashback at the time of the incident and could not control his behavior. In their opinion, some event at the garage triggered the flashback, causing defendant to believe that he was in Vietnam and under imminent danger of sniper attack. According to these experts, he believed that the victim was a Vietnamese woman who had betrayed his company and that he was driving her to a prisoner-of-war camp. The State contended that defendant was simply fleeing from prosecution when he kidnapped and raped the victim, and his mental abnormality was "manifested only by repeated criminal or otherwise antisocial conduct," not as a result of a mental disease or defect. 13 V.S.A. § 4801(a)(2).

## I.

### Prior Bad Acts

The State introduced the testimony of a psychiatrist about two uncharged criminal offenses committed by defendant in 1972. Defendant had told the psychiatrist that in one incident he had gone to a college campus to collect a drug debt from a student and then blacked out from drugs. Police records and other documents given to the expert to review showed, however, that defendant had never met the student before, had accosted her at gunpoint, and had sexually assaulted her. Afterward he had taken her back to her dorm and engaged in casual conversation. Defendant related another incident of kidnapping a

woman to the expert, but no details were given other than a name and the year.

The court admitted this testimony over defendant's objection that any relevance to sanity was "substantially outweighed by the danger of unfair prejudice." V.R.E. 403.[1] The State's position was that the incidents were relevant as part of the basis for the opinion of its expert witness on the issue of sanity.

A discretionary ruling admitting relevant evidence under Rule 403 is given considerable latitude on appeal because the rule requires that exclusion of the evidence is permitted only upon a showing that the risk of unfair prejudice to the defendant substantially outweighs the probative value of the evidence. See *State v. McElreavy*, 157 Vt. 18, 23, 595 A.2d 1332, 1334–35 (1991) (burden to show abuse of discretion under Rule 403 is "heavy" and "often difficult to satisfy").

The prejudice defendant complains about is the potential that the jurors would infer that he had a propensity to commit violent crimes as "a man of dangerous criminal character." Yet, defendant conceded at trial that he had committed violent acts. His point was that he acted violently because he was legally insane at the time. The claimed unfair prejudice, therefore, was what made the evidence relevant. Defendant either acted with criminal propensity, as claimed by the State, or acted as a result of insanity, as claimed by defendant. The central issue for the jury was why defendant acted violently toward women. The general rule, therefore, that character evidence is not admissible to prove that defendant "acted in conformity therewith on a particular occasion" did not apply in this case. The prosecution offered evidence to rebut "a pertinent trait of his character offered by an accused," and it was admissible for that reason. V.R.E. 404(a)(1). Because defendant put his sanity in issue, his prior conduct relevant to sanity was admissible when offered by the State.

The 1972 incidents were particularly relevant because they occurred closer in time to defendant's return from Vietnam.

---

[1] V.R.E. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

They were relevant to defendant's sanity from either side's point of view. Had no psychotic episodes occurred between 1970 and 1981, defendant's insanity defense would have been less credible. Defendant claimed that he committed the 1972 acts in a psychotic state, and several of his expert witnesses agreed.

Defendant contends the evidence about the 1972 incidents was inconclusive and their probative value therefore was "attenuated and uncertain." The contention that the evidence was not as decisive as it could have been is difficult to understand; had the evidence more strongly suggested that defendant was not delusional during the 1972 incidents, the State's case would have been stronger.

As is often the case when insanity is at issue, the acts charged are conceded and the history of behavior relevant to the central issue depicts defendant in a devastating way. Jurors may react to such evidence in opposite ways—favoring a conclusion that defendant was insane "because a sane person would not do such things" or disfavoring the defense because such a person is viewed as too dangerous to benefit from the defense. Regardless of the potential reactions, withholding information about defendant's behavioral history undercuts the integrity of the jury's factfinding function. Raising the insanity defense is radical legal surgery. The risks are great, but the evidence must not be so truncated that the verdict becomes uninformed.

## II.
### Admission of Connecticut Offense without Use Immunity

In a pretrial conference, defendant sought use immunity for any testimony he might give regarding the Connecticut sexual assault. He claimed his right to testify was chilled by his fear of self-incrimination in a potential later criminal prosecution in Connecticut. The court encouraged the prosecution to seek immunity from Connecticut authorities, but it was not forthcoming. At trial, the victim was allowed to testify about the Connecticut sexual assault. Defendant did not take the stand. He claims that, absent the showing of a good faith effort to secure immunity in Connecticut, the victim's testimony about criminal activity there should have been excluded. Defendant, however, made no objection on this ground. Nevertheless, we find no error on this record.

Defendant bases his challenge on the rule that a probationer at a revocation hearing must be offered use immunity so that he can testify without fear of self-incrimination in a subsequent criminal prosecution. See *State v. Begins*, 147 Vt. 295, 299, 514 A.2d 719, 722 (1986). The *Begins* rationale is not applicable, however, because the trial court had no power to grant defendant use immunity in a Connecticut court for any testimony he might give in a Vermont court.

We know of no case requiring the State to attempt to secure use immunity in circumstances like this. Nor has defendant offered any practical reason why his right to testify was chilled, given his insanity defense. We fathom no significant procedural deprivation under the circumstances presented here.[2]

## III.

### Kidnapping Instruction

The court instructed the jury that the State must prove beyond a reasonable doubt that defendant "knew *or should have known* that the forcible confinement of [the victim] was practically certain to result from his conduct, whatever his conscious desire may have been. And . . . that he knew he had no legal right, justification or authority to do so." (Emphasis added.) After the jury began deliberations, defendant informed the court that he objected to the instruction, pointing out that the words "or should have known" impermissibly allowed the jury to convict defendant based on constructive as opposed to actual knowledge. The court refused to change the instruction because the language was inserted in a quote in *State v. Audette*, 149 Vt. 218, 220, 543 A.2d 1315, 1316 (1988). In *Audette*, we held that a jury charge for kidnapping must include the element of intent, and noted that general intent is proved if "the defendant consciously desires the result, or . . . 'he knows [or should have known] that that result is practically certain to follow from his conduct, whatever his desire may be as to that

---

[2] Defendant also contends that the trial court should not have relied on the Connecticut offense at sentencing absent a grant of use immunity as to that crime. Our rationale that immunity did not affect the admissibility of evidence is equally applicable to the issue of sentencing.

result.' " *Id.* (quoting 1 W. LaFave & A. Scott, Substantive Criminal Law § 3.5(a), at 304 (1986)). After the trial in this case, *Audette* was overruled in this respect. *State v. Sargent*, 156 Vt. 463, 465, 594 A.2d 401, 402 (1991) ("While the 'should have known' language appears in dicta in *Audette* itself, a closer examination of *Audette* makes clear that the inquiry into defendant's intent is a subjective one.").

The objection was untimely. V.R.Cr.P. 30 (objection to jury charge must be made before jury retires to consider its verdict). Because the issue was not preserved, a reversal is warranted only upon a finding of plain error. *State v. Dion*, 154 Vt. 420, 424, 578 A.2d 101, 103 (1990).

■ Plain error has not been shown. Here, the only significant issue was defendant's sanity. No serious dispute over what happened to the victim was in issue. She was abducted at gunpoint, tied up, sexually assaulted, and forcibly confined for eight and a half hours. We believe the instruction on constructive knowledge had no impact on the verdict.

## IV.
### Instruction on Reasonable Doubt

Defense counsel made two objections to the instructions on reasonable doubt. He objected to the court's use of the term "actual doubt" in defining reasonable doubt. *United States v. Newport*, 747 F.2d 1307, 1308 (9th Cir. 1984) ("real doubt" simply means a doubt which is not "unreal, apparent, or imaginary"). Second, he requested a charge that a reasonable doubt is "the kind of doubt that would make one hesitate."

The latter instruction was omitted on the strength of *State v. Francis*, 151 Vt. 296, 302–04, 561 A.2d 392, 395–97 (1989). Although the instruction in *Francis* was not grounds for reversal, we cast doubt on the language "so convincing that reasonable people like yourselves would not hesitate to act on it in matters of personal importance in your own life." We reasoned, "If people really did make important personal decisions only when convinced beyond a reasonable doubt as to their correctness, human activity would evidence far more inertia than it does." *Id.* at 304, 561 A.2d at 396.

Here, defendant objected that the proposed charge stressed what a reasonable doubt was not, without sufficiently saying

what it was. Acknowledging our warnings in *Francis*, defendant asserted that his request for "the kind of doubt that would make one hesitate" was still good law because it left out the offending "matters of personal importance." The court, however, declined to give the requested instruction.

As to both objections, we find no error. Where, taken as a whole, the jury instructions accurately reflect the law, defendant may not complain because the court has refused to employ the exact terms he has requested. *State v. Baril*, 155 Vt. 344, 351, 583 A.2d 621, 625 (1990). Once the trial court has stated the rule of reasonable doubt correctly, "[n]othing further by way of definition [is] required." *State v. Marston*, 82 Vt. 250, 251, 72 A. 1075, 1076 (1909). As we recently said in *State v. McMahon*, 158 Vt. 640, 641, 603 A.2d 1128, 1129 (1992), "We have never held that a defendant is entitled to an explanation of 'reasonable doubt,' and the court did not err in declining to offer a definition of that phrase once it had correctly stated the rule."

## V.

### Speedy Trial

The second trial of this case did not occur until twenty-eight months after defendant's initial convictions in a trial by court were reversed and remanded. *State v. Percy*, 149 Vt. 623, 548 A.2d 408 (1988). Nearly eleven months of the delay was caused by the failure of the trial judge to act on a motion to amend his findings. After defendant moved to dismiss for lack of a speedy trial, the judge disqualified himself. The presiding judge for this trial denied the motion to dismiss.

Defendant argues that the delay in this case was prejudicial per se under *State v. Franklin*, 136 Vt. 568, 396 A.2d 138 (1978), because the cause of delay was the same here as in *Franklin* and the length of the delay was no less. In *Franklin*, this Court recognized that analysis of denial of the right to a speedy trial requires a review of the circumstances "on a case by case" basis. *Id.* at 570, 396 A.2d at 139. Yet, without reference to any authority, we held that eighteen months of delay between citation and trial not attributable to defendant was "so long as to constitute prejudice as a matter of law," and violated defendant's right to a speedy trial. *Id.* at 570–71, 396 A.2d at 139.

■ *Franklin* stands alone in our jurisprudence as establishing a per se rule of prejudice. Ordinarily, a balancing test is employed to decide speedy trial issues because "it is 'impossible to determine with precision when the right [to speedy trial] has been denied.'" *State v. Recor*, 150 Vt. 40, 42, 549 A.2d 1382, 1384 (1988) (quoting *Barker v. Wingo*, 407 U.S. 514, 521 (1972)). The United States Supreme Court has rejected a per se approach in favor of an analysis of the right within the context of the particular case. *Barker*, 407 U.S. at 530–31. We reject use of a per se test and overrule *Franklin* in that respect.

■ ■ The balancing test weighs the length of delay, reasons for delay, the defendant's timeliness in assertion of the right, and prejudice to the defendant to determine whether a defendant's right to a speedy trial has been denied. *State v. Snide*, 144 Vt. 436, 442, 479 A.2d 139, 143 (1984). In this case, the delay was long enough to trigger the balancing test, but defendant was not prejudiced by the delay. No claim was made that his defense was impaired by the delay, and no witnesses became unavailable. See *State v. French*, 152 Vt. 72, 77–78, 564 A.2d 1058, 1061 (1989). We find no abuse of discretion in the trial court's denial of the motion.

## VI.

### Harsher Sentence at Retrial

■ The trial court sentenced defendant on all counts to a total of 42–60 years. Defendant had received a combined sentence of 41–50 years in his first trial. Defendant claims that the harsher sentence following his appeal of the first conviction violates his Vermont constitutional right to due process. In another of his appeals, we rejected this claim under the federal constitution. *State v. Percy*, 156 Vt. 468, 481–82, 595 A.2d 248, 255 (1990). Defendant raises the Vermont constitutional issue for the first time on appeal, and it is therefore not preserved. *State v. Gleason*, 154 Vt. 205, 210–11, 576 A.2d 1246, 1249 (1990).

Defendant also contends that the sentencing court made remarks that revealed an intent to penalize him for having appealed his conviction, thereby establishing evidence of vindictiveness. Before sentencing, the trial court said:

[The victim] and her family have experienced trauma, and that trauma . . . continues to this date. It's been a full decade, during which [they] have had to live day-to-day with this situation. The delay, of course, is not your fault. You exercised the rights which are available to you, no one in any way wishes to deny you those . . . .

Later, the court explained that "the victim does continue to suffer the effects of the defendant's crimes to this day. . . . This ongoing anguish is separate from any distress resulting from the defendant's exercise of his appellate rights."

▮▮▮ On this record, defendant's claim of vindictive sentencing is not established. The court's remarks dispel any hint of it. *State v. Meyers*, 153 Vt. 219, 225, 569 A.2d 1081, 1085 (1989) ("we will accept at face value the court's reasons for imposing the sentence"); *State v. Rathburn*, 140 Vt. 382, 388, 442 A.2d 452, 455 (1981) (court's express statement that it did not rely upon improper factor was controlling); *In re Morrill*, 129 Vt. 460, 464, 282 A.2d 811, 814 (1971) (we presume trial court did not rely upon factors it recognized as improper).

## VII.

### Credit in Sentencing for Time Served

Defendant was given four consecutive sentences: 18–25 years for kidnapping, 15–20 for sexual assault, 5–10 for assault and robbery, and 4–5 for possessing a weapon during the commission of a felony. These were to be served consecutively to the 18–20 year sentence imposed after his first conviction. The trial court gave defendant credit for ten years spent in custody toward service of the sentences imposed. Defendant maintains that the court should have given him forty years' credit pursuant to 13 V.S.A. § 7031(b). That statute states: "The court shall give the person credit towards service of his sentence for any days spent in custody in connection with the offense for which sentence was imposed." In other words, defendant reads § 7031(b) as compelling the application of credit for time served as if the multiple sentences were concurrent.

▮▮▮ The amount of pretrial credit toward a particular sentence depends upon whether the sentence is consecutive or concurrent. If the sentences are concurrent, the prisoner must be given credit for pretrial detention towards all the sentences. *In*

re *Lampman*, 135 Vt. 226, 227–28, 373 A.2d 547, 547–48 (1977). But if the sentences are consecutive, a single credit is given. *In re Perry*, 137 Vt. 168, 170–71, 400 A.2d 1013, 1015 (1979) (purpose of the statute is to provide equal sentencing treatment for persons who raise bail and those who cannot). We see no reason to overrule this interpretation of § 7031(b). When all is said and done, a number of consecutive sentences becomes one sentence, and it is against this sentence, as "imposed," that pretrial detention is credited.

## VIII.

### Ex Parte Discussion of Sentence Computation

Before sentencing, the court made an ex parte telephone call to an employee of the Department of Corrections to discuss the methodology used for computing credit for time served. After sentencing, the court informed the parties about the telephone conversation and explained that its sole purpose had been to clarify the mathematics in making the computations. Defendant objected to the contact as a violation of the canons of judicial conduct and moved to vacate the sentence and for resentencing before a different judge.

Defendant claims that the judge's contact violated his right to advance disclosure of information pertinent to sentencing. V.R.Cr.P. 32(c)(3), (4); *State v. Ramsay*, 146 Vt. 70, 81, 499 A.2d 15, 22 (1985) (full disclosure of information must be made before sentencing to allow adequate opportunity for rebuttal). Here, however, defendant does not contest what the court learned over the telephone. Rather, he faults the ex parte nature of the procedure. Defendant had access to the information, since the method of computation the court discussed in the telephone conversation was contained in an exhibit in evidence.

Defendant has not shown prejudice. The court had decided that defendant should be eligible for parole in the year 2016. The call was made to do a correct calculation to achieve that result. Nor can defendant's claim of partiality be supported in light of the purely technical nature of the inquiry. See *In re C.W.*, 148 Vt. 282, 287, 532 A.2d 566, 570 (1987) (judge's questions about matters outside the record were improper, but in context were not prejudicial).

*Affirmed.*