# State of Vermont v. James E. Keith

[628 A.2d 1247]

No. 91-582

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed May 21, 1993

258

*Howard E. VanBenthuysen*, Franklin County State's Attorney, and *Jo-Ann L. Gross*, Deputy State's Attorney, St. Albans, for Plaintiff-Appellee.

*Charles Martin* and *Edward Wayland*, Law Clerk (On the Brief) of *Martin & Paolini*, Barre, for Defendant-Appellant.

**Gibson, J.** Defendant appeals from a jury conviction of first-degree arson, in violation of 13 V.S.A. § 502. He argues that the trial court committed reversible error by refusing to suppress two statements he made on separate occasions to different police officers. He contends that in both instances his intoxicated state prevented him from making a knowing and intelligent waiver of his constitutional rights, as required by *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966), and that the court should have suppressed the second statement because the police did not obtain a signed waiver of his right to counsel, as required by 13 V.S.A. § 5237. He also argues that the court abused its discretion by refusing to dismiss the prosecution for lack of a speedy trial. We affirm.

I.

On December 19, 1989, Swanton Police Chief Michael McCarthy arrested defendant and transported him to the police station for questioning regarding incidents involving the passing of forged checks. Chief McCarthy noticed that defendant had been drinking but had no problem "functioning." At the station, Chief McCarthy read defendant his *Miranda* rights from a form consisting of eight parts, each followed by a question asking defendant whether he understood the preceding part. Defendant's responses included comments such as, "That's right," "Not guilty," "Yeah, anytime," and "What do I want a lawyer for. No." Chief McCarthy described defendant's demeanor as "indifferent" and "cocky." Defendant acknowledged his responses by initialing the waiver form.

Defendant then gave a statement explaining his actions concerning the forged checks. After this statement was transcribed and signed, he became increasingly upset while explaining that the alleged victim, Philip Seymour, had not paid him for work previously performed. During the course of this conversation, defendant stated that "he would get even with [Mr. Seymour], he'd just burn his barn down." Although Chief McCarthy was taken aback by the comment, he did not alter the already transcribed statement to include the comment. Two weeks later, upon learning that Mr. Seymour's barn had burned down, he wrote out an affidavit concerning defendant's comment for Sergeant Bombardier of the state police, who was assigned to the fire investigation unit.

On New Year's Eve, December 31, 1989, Mr. Seymour's barn was destroyed by fire. Upon learning that defendant had made threatening statements about burning the barn and had been at the scene of the fire in an intoxicated state, Sergeant Bombardier decided to talk with defendant. On January 1, 1990, the day after the fire, the officer found defendant on Mr. Seymour's property, which was a violation of a prior court order. Sergeant Bombardier took defendant into custody and transported him to the state police barracks, where he read defendant his *Miranda* rights. Defendant responded to most of the questions by saying, "Yes. Not Guilty." Although he was aware that defendant had been drinking, Sergeant Bombardier believed that defendant understood his rights and was "playing head games" with his responses. Although defendant was willing to talk, he refused to sign the waiver form, saying, "Every time I sign something I get in trouble."

Following his refusal to sign the waiver form, defendant continued to answer in the affirmative when Sergeant Bombardier asked him if he understood his rights and wanted to talk. Defendant then provided a number of inconsistent versions of his whereabouts and actions on the night of the fire. Officer Bombardier wrote out a statement, which defendant signed. The statement indicated that on the night of the fire defendant saw one of Mr. Seymour's hired hands, who had threatened Mr. Seymour earlier in the day, walking from the barn two or three minutes before the fire began, carrying a red can. Shortly after defendant signed the statement, he submitted to an alcosensor test, which showed his blood-alcohol content to be .203%. He was then taken to the correctional center because he would neither agree to remain at the detoxification center voluntarily nor arrange to have someone pick him up.

On January 23, 1990, defendant was charged by information with first-degree arson. He remained in jail because of his failure to pay the $5000 cash bail. He filed motions to suppress in April and May of 1990, and a hearing on the motions was held on June 7, 1990. In October, defendant sought and was granted release into his mother's custody, subject to certain restrictions. On November 15, he was arrested for violating one of the conditions of release. He remained in jail for failure to pay the $1000 cash bail. On December 20, the trial court denied defend-

ant's motions to suppress. A jury drawing was held a month later, but a mistrial was declared after jurors overheard defendant complain about having been in jail for a year. Another mistrial was declared on April 16, 1991 because the jurors had discussed the case prior to being brought into the courtroom.

On May 6, 1991, defendant filed a motion to dismiss for lack of a speedy trial. A hearing on the motion was set for July 15, but the hearing did not take place until September 10 because of two motions to continue by each of the parties. Defendant's motion to dismiss was denied, and the jury trial took place on October 9–10, 1991. Defendant was found guilty and sentenced on November 12, 1991 to four to ten years to serve. This appeal followed.

## II.

Defendant first contends that his *Miranda* rights were not knowingly and intelligently waived because he was intoxicated on the two occasions when he made statements to the police. Defendant relies on the *Miranda* decision and other case law interpreting the federal constitution. Because the United States Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment," *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), defendant's primary argument is that his waiver was not "knowing and intelligent." He also contends, however, that his statements were involuntary because they were taken by the police despite the fact that they knew he was drunk.

The State must prove by a preponderance of the evidence that a waiver of *Miranda* rights is voluntary, knowing, and intelligent. *State v. Caron*, 155 Vt. 492, 504, 586 A.2d 1127, 1134 (1990). The trial court must favor every reasonable presumption against a waiver of these rights, but it alone determines the weight and sufficiency of the evidence and the credibility of the witnesses. See *State v. Stanislaw*, 153 Vt. 517, 529, 573 A.2d 286, 293 (1990); *State v. Malinowski*, 148 Vt. 517, 520, 536 A.2d 921, 923 (1987). On appeal, we give great deference to the trial court's findings of a waiver under the totality of the circumstances. *Stanislaw*, 153 Vt. at 529, 573 A.2d at 293.

We will uphold the court if its ruling is not clearly erroneous and is supported by credible evidence, even though evidence to the contrary exists. *Id.*

██ ██  The question of whether *Miranda* rights have been validly waived must be determined on the particular facts and circumstances of each case, "including the background, experience and conduct" of the defendant. *North Carolina v. Butler*, 441 U.S. 369, 374–75 (1979); *Malinowski*, 148 Vt. at 522, 536 A.2d at 924. This totality-of-the-circumstances approach may include consideration of such factors as the defendant's experience with the police and familiarity with the warnings, in addition to the defendant's age, level of intelligence, level of education, reading ability, and physical and mental condition. See *Malinowski*, 148 Vt. at 522, 536 A.2d at 924; *State v. Usry*, 533 A.2d 212, 216 (Conn. 1987). Intoxication is an important factor that bears on the waiver's validity, but it does not, of itself, require the conclusion that a waiver was invalid. Indeed, courts have generally not suppressed statements based solely on the defendant's claim of being under the influence of drugs or alcohol. See, e.g., *State v. Norris*, 768 P.2d 296, 302–03 (Kan. 1989) (despite testimony that defendant had consumed half a case of beer and some whiskey before interrogation, defendant's responses and behavior indicated he made a valid waiver of his rights); *Commonwealth v. Shipps*, 507 N.E.2d 671, 676 (Mass. 1987) (though defendant appeared glassy-eyed and smelled of alcohol during interrogation, he had no difficulty understanding what was said to him); see generally 1 W. LaFave & J. Israel, Criminal Procedure § 6.9, at 527 (1984) ("defendants have generally been unsuccessful in claiming that their *Miranda* waivers should be held invalid because they were either intoxicated or under the influence of drugs").

██  Here, defendant argues that his intoxicated state and inappropriate responses to questions concerning his understanding of his rights indicate that his waiver of those rights was not knowing or intelligent. We disagree. The only testimony presented at the suppression hearing was by the interrogating officers. Regarding the first interrogation prior to the fire, Chief McCarthy testified that, while it was apparent defendant had been drinking, he had no problem walking to the

cruiser or getting in or out of the vehicle. He also testified that defendant's conversation "made sense." Defendant points out that Chief McCarthy testified that he would not have let defendant drive without first testing his level of intoxication. But this fact does not indicate that defendant was incapable of waiving his rights. We have previously noted that "the concern for the effects of the use of intoxicants with respect to the operation of motor vehicles is different in both kind and quantum from the concerns about mental condition as related to homicide." *State v. Pease*, 129 Vt. 70, 75, 271 A.2d 835, 839 (1970). The mere fact that defendant may have been too intoxicated to operate a vehicle legally does not indicate that he did not know what he was doing when he waived his rights. See *People v. Moore*, 97 Cal. Rptr. 601, 603 (Ct. App. 1971) (intoxication, even to extent of physical impairment, is not necessarily equivalent of mental impairment).

Defendant also points to the fact that he provided inappropriate responses in answering questions concerning the waiver of his rights. We are not persuaded by this argument. Chief McCarthy testified that he "very much felt" that defendant was being "cocky" with his responses. He also testified that defendant's statement immediately following the waiver of his rights was coherent and informative regarding the charges against him. Given defendant's numerous prior encounters with police, his demeanor at the time of the interview, and his subsequent willingness to talk, defendant's responses do not indicate that he failed to understand the rights he was waiving.

■ Much of defendant's argument concerning the second statement is the same. He also notes, however, that Sergeant Bombardier had seen defendant preparing to drink a large quantity of whiskey the day of the interview, that an alcosensor test given to defendant shortly after the interview revealed a .203 blood-alcohol level, more than twice the legal limit, and that defendant's statement was so confused and inconsistent that it indicated defendant was drunk at the time. These additional facts are not dispositive. Regarding defendant's blood-alcohol level, that level alone does not show that he was unable to understand or waive his rights, since the effect of a given amount of alcohol depends on a number of factors, and there is no established standard correlating blood-alcohol content with

mental impairment. *Moore*, 97 Cal. Rptr. at 603 (because there is no established standard for cerebral impairment, a blood-alcohol reading of .229, standing alone, neither proves nor disproves a defendant's capacity to understand the waiver of *Miranda* rights).

Sergeant Bombardier testified that though it was obvious defendant had been drinking, he understood what was going on and he made it clear that he wanted to talk. Sergeant Bombardier believed that defendant was "playing mind games" with his responses. The officer testified that defendant's statement was inconsistent and confusing, not because defendant was too drunk to think straight, but because he kept switching his version of the sequence of events when the officer pointed out that certain statements were inconsistent with known facts or prior statements. Upon review of the record, we conclude that there is substantial credible evidence in support of the trial court's conclusion that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.

Defendant also argues that the second statement should have been suppressed because he refused to sign a written waiver of his right to counsel, as required by 13 V.S.A. § 5237 and our decision in *Caron*. Section 5237 provides that a person "may waive in writing, or by other record" the right to be represented by an attorney at state expense. We have recently held that this provision requires "more than a police officer's written memorandum of an oral waiver given by a suspect." *Caron*, 155 Vt. at 510, 586 A.2d at 1138. The State argues that defendant's signature at the bottom of his subsequent statement to police is sufficient because the statement contains the acknowledgment that it "is given of my own free will and accord" absent any threats or coercion. We disagree.

■ In *Caron*, we held that § 5237 was satisfied where the officer read the defendant his *Miranda* rights from a waiver form that listed the individual *Miranda* rights, each followed by a question asking whether the defendant understood the individual right. The defendant answered yes to each question and the officer checked the form indicating that the defendant had acknowledged understanding those rights, including the right to counsel. The defendant signed the form just below a provision indicating that he had been advised of those rights,

that he understood them, and that he chose to waive them. *Id.* at 497–98, 586 A.2d at 1130–31. Here, defendant explicitly stated that he would not sign the waiver form; later, he signed a statement that made no mention of the right to counsel but merely contained an acknowledgement that the statement was made of his own free will. Given these facts, *Caron* does not support a finding of a written waiver of the right to counsel.

Although we cannot accept the State's argument that § 5237 was satisfied in this instance, we find no reversible error because the admission of the statement was harmless. Rather than making any claim of prejudice, defendant contends that our case law, particularly *State v. Zehner*, 142 Vt. 251, 253, 453 A.2d 1126, 1127 (1982), requires reversal here. We disagree. *Zehner* and the other cases relied on by defendant refused to uphold convictions founded on involuntary *confessions*, regardless of whether there was other evidence sufficient to support the convictions. Here, however, the admitted statement was not a confession. See *People v. Taylor*, 169 Cal. Rptr. 290, 298 (Ct. App. 1980) (harmless-error inquiry appropriate because statements were admissions rather than a confession). Further, the United States Supreme Court has recently ruled, in a 5–4 decision, that admission of an involuntary statement or confession is subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265 (1991).

■ The statement to Sergeant Bombardier was nothing more than defendant's attempt to point the finger at another person. It was inculpatory only to the extent that it might have revealed inconsistencies in defendant's explanation of what happened on the night of the fire. At trial, Sergeant Bombardier did testify on direct that defendant gave several inconsistent accounts of what happened that night. The only specific example he gave, however, was that defendant said he saw someone else set the fire in the barn's hayloft, which, according to the sergeant, was not visible from the particular room of a nearby house defendant claimed to be in at the time. This testimony was an insignificant part of the evidence presented during the two-day trial. Indeed, in denying defendant's motion to dismiss at the close of the State's case, the trial court did not even mention defendant's statement to Bombardier. Neither did the prosecuting attorney mention the statement during his closing

argument. The heart of the State's case was defendant's statements to Chief McCarthy and two other persons concerning his intention to burn down the barn or his affirmation of having done so. Upon review of the record, we conclude that the admission of defendant's statement to Sergeant Bombardier was harmless because it is clear beyond a reasonable doubt that the jury would have rendered a guilty verdict absent the offending evidence. See *State v. Lynds*, 158 Vt. 37, 42, 605 A.2d 501, 503 (1991) (to avoid reversal, we must find that constitutional error was harmless beyond reasonable doubt).

## III.

Defendant also contends that he was denied a speedy trial, in violation of his constitutional right to due process and this Court's Administrative Order No. 5, § 2. He bases his claim on the 20-month delay between his arraignment and trial. He points out that where a defendant is in custody, as here, our administrative order contemplates that trial will be held within ninety days of the arraignment, excluding periods of delay caused, among other things, by pretrial motions or continuances granted by the court with the consent of the defendant. We conclude that the court acted within its discretion in denying defendant's motion to dismiss. See *State v. French*, 152 Vt. 72, 75, 564 A.2d 1058, 1060 (1989) (determination of claim of speedy trial violation is within discretion of trial judge).

The failure to bring a defendant to trial within the time limits set by our administrative order does not necessarily mean that the defendant was denied a speedy trial or that the case against him must be dismissed. *State v. Venman*, 151 Vt. 561, 574, 564 A.2d 574, 583 (1989); see *State v. Snide*, 144 Vt. 436, 441, 479 A.2d 139, 142 (1984) (administrative order "neither grants nor deprives a criminal defendant of any procedural or substantive rights"). Thus, rather than quibble over calculations of time periods to determine whether Administrative Order No. 5 was satisfied, we examine the circumstances of this case according to the standards set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), and analyzed in several of our prior decisions. See, e.g., *Venman*, 151 Vt. at 574–75, 564 A.2d at 583–84; see also *State v. Percy*, 158 Vt. 410, 420, 612 A.2d 1119, 1126

(1992) (regardless of length of delay, applying four *Barker* factors as balancing, not per se, test is appropriate). Those four factors are the length of the delay, the reason for the delay, defendant's efforts at obtaining a speedy trial, and the prejudice to the defendant. *Barker*, 407 U.S. at 530, 532.

It is unnecessary to examine the reasons for the delay as part of the calculation of the length of the delay, as we have done on occasion in the past; we simply note that the 20-month delay here far exceeds the length of delay needed to trigger a review of the other three factors. See 2 W. LaFave & J. Israel, *supra*, § 18.2, at 406 (some courts mistakenly consider the reasons for delay in applying the length-of-delay factor); see also *State v. Unwin*, 139 Vt. 186, 195, 424 A.2d 251, 257 (1980) ("delay of more than six months in a case involving an incarcerated defendant is long enough to require that the other factors be considered"), *cert. denied*, 450 U.S. 1033 (1981).

With respect to the second *Barker* factor, we conclude that much of the delay is not attributable to the court or the prosecution. Following the arraignment on January 23, 1990, a March 25 motion deadline date was set at a February 22 status conference. In response to defendant's motion, that deadline was extended to April 13. Defendant filed motions to suppress on April 18 and May 3. In May, defendant's counsel withdrew and another attorney was appointed. The hearing on the motion to suppress was held on June 6. On October 9, the court granted defendant's motion to review bail and released defendant into his mother's custody. Defendant remained free until November 14, when he was arrested for violating one of the conditions of his release. On December 20, 1990, the court denied defendant's motion to suppress. A jury drawing was held on January 22, 1991, but the court declared a mistrial when, in the presence of the jurors, defendant complained about having spent a year in jail for nothing. Thus, in the first year, the only significant delay attributable to the State or the court is the inordinate amount of time—six months—that it took for the trial court to rule on the motions to suppress.

The next jury drawing was set for February 26, 1991, but the court granted defendant's motion to continue and the jury drawing was not held until April 16. The court declared another mistrial, however, because the jurors had discussed the case

beforehand. On May 6, defendant filed a motion to dismiss for lack of a speedy trial. Despite that motion, defendant filed two more motions to continue, one on May 13 and the other on July 2. A jury drawing was eventually set for August 20. The State then filed motions to continue on August 2 and August 15. A jury drawing was scheduled for September 10, but the State was not ready for trial on that date. Finally, a jury drawing was held on October 8, and the trial began the next day. These dates reveal that less than two months of the delay after the first mistrial were directly attributable to the State. *See French*, 152 Vt. at 76, 564 A.2d at 1060 (time from information to mistrial is calculated separately for purposes of lack-of-speedy-trial claim). Allowing the court some time to respond to defendant's motions to suppress, we estimate that the court or the State was responsible for approximately seven months of unreasonable delay, none of which constituted a deliberate attempt by the prosecution to hinder the defense. See *Unwin*, 139 Vt. at 195–96, 424 A.2d at 257 (reasons for delay other than deliberate attempt to hinder defense should be weighted less heavily against the State). Much of the rest of the delay can be traced to defendant's motions or reasonable court scheduling.

The third *Barker* factor examines the aggressiveness with which the defendant asserted his right to a speedy trial. *Id.* at 196, 424 A.2d at 257. While the timing of the request for a speedy trial must be considered, we have repeatedly stated that a motion to dismiss for lack of a speedy trial is not the equivalent of a demand for an immediate trial. *Id.*; *French*, 152 Vt. at 77, 564 A.2d at 1061. Here, defendant never requested an immediate trial. Although he did request a ruling on the motions to suppress shortly before it was rendered in December 1990, and he filed his first motion to dismiss based on lack of a speedy trial in May 1991, subsequent delays attributable to defendant make this factor weigh against him.

The most important factor is whether defendant was prejudiced. *Unwin*, 139 Vt. at 197, 424 A.2d at 257. Prejudice may take the form of lengthy pretrial incarceration, anxiety suffered by the defendant, or impairment of the defense at trial, but the most important consideration is the latter. See *State v. Recor*, 150 Vt. 40, 42, 549 A.2d 1382, 1384–85 (1988). Indeed, where there is no showing of prejudice to the defense at trial,

we have denied lack-of-speedy-trial claims despite the fact that the defendant was jailed for a significant period before trial. See, e.g., *State v. Roy*, 151 Vt. 17, 35–36, 557 A.2d 884, 895–96 (1989) (defendant in custody during seven-month period from arrest to trial); *Unwin*, 139 Vt. at 197, 424 A.2d at 257–58 (despite "lengthy pre-trial incarceration," fourth factor not weighted heavily in favor of the defendant where he failed to make any specific claims of prejudice); see also 2 W. LaFave & J. Israel, *supra*, § 18.2, at 410 ("As for prejudice [arising from pretrial incarceration], it is noteworthy that in *Barker* the defendant's incarceration for 10 months was not deemed sufficiently oppressive to call for a ruling in his favor. Lower courts have reached the same conclusion as to substantially longer periods of imprisonment.").

Defendant does not make any specific claims of prejudice here, but the obvious prejudice is the long period of incarceration prior to trial. That significant length of jail time is somewhat diminished by the fact that defendant was freed relatively early on, albeit with strict conditions, only to be arrested a month later for a violation of those conditions. Notwithstanding this fact, we recognize that any pretrial restraint on defendant's liberty is prejudicial, and we are troubled by the extended pretrial incarceration in this case. But considering all the *Barker* factors, and applying them to the facts and circumstances here, we cannot conclude that the court abused its discretion in denying defendant's motion to dismiss for lack of a speedy trial.

We note that defendant makes no specific argument that the Vermont Constitution offers more protection than that provided by the United States Supreme Court's interpretation of the federal constitution. In upholding the court's denial of defendant's speedy-trial motion, we recognize that the federal test provides only a limited right to a speedy trial. Rather than guarantee prompt disposition of criminal cases, the right requires the dismissal of criminal charges only against a very few defendants who have suffered egregious delays and prejudicial consequences due to the government's failure to process their cases in a timely manner. 2 W. LaFave & J. Israel, *supra*, § 18.3, at 410–11. The delays generally must be egregious both in dura-

tion and result because, as noted, the courts are reluctant to resort to the radical remedy of dismissal—the only remedy available to them. See *Barker,* 407 U.S. at 522 (dismissal of indictment means a defendant who may be guilty of a serious crime will go free).

The reluctance of courts to employ this remedy is exemplified by a recent opinion of the Second Circuit Court of Appeals. See *Flowers v. Warden, Connecticut Correctional Inst.,* 853 F.2d 131 (2d Cir.), *cert. denied,* 488 U.S. 995 (1988). Although the defendant had made numerous assertions of his right to a speedy trial and, because of docket congestion, had spent seventeen months in jail while awaiting trial on a murder charge, the court reversed the district court's judgment dismissing the indictment. *Id.* at 134. The bases of the court's decision were that there was no bad faith on the part of the prosecution and the defendant had suffered no prejudice to his defense. *Id.* In support of the decision, the court surveyed numerous previous cases in which it had denied speedy-trial claims. An examination of these cases provides insight into the difficulty of prevailing on a constitutional speedy-trial claim and, indeed, suggests that the constitutional right to a speedy trial is virtually nonexistent when prejudice to the defense is absent.

We do not mean to imply that there is no risk of dismissal where delay results in actual prejudice. The State and the trial courts must be aware that unreasonable delay may result in dismissal. But we need to gain more widespread control over delay in the administration of criminal cases. Our failure to adequately address such delay only exacerbates the problem.

It may be necessary to look to our own constitution for a satisfactory solution that has not been forthcoming under the federal test. See *State v. Dean,* 148 Vt. 510, 515–16, 536 A.2d 909, 913 (1987) (suggesting that Chapter I, Article 4 and Chapter II, § 28 of the Vermont Constitution may offer additional protection against unreasonable delay in criminal cases). Reliance on the Vermont Constitution may be necessary because, unlike most states and the federal government, Vermont has no statutory right to a speedy trial to back up the infrequently employed federal constitutional right. As we noted, Administrative Order No. 5 does not provide procedural or substantive rights to defendants. Not only defendants, but the public as well,

should have some reasonable guaranty that criminal cases will be heard in a timely manner. See *Barker*, 407 U.S. at 519–20 (society has an interest in avoiding lengthy pretrial incarceration and bringing charges to trial without delay).

*Affirmed.*