### State of Vermont v. Christopher Bacon

[658 A.2d 54]

No. 92-534

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed February 17, 1995

*Jeffrey L. Amestoy*, Attorney General, and *Susan R. Harritt*, Assistant Attorney General, Montpelier, and *Dan M. Davis*, Windham County State's Attorney, and *Karen Carroll*, Deputy State's Attorney, Brattleboro, for Plaintiff-Appellee.

*Robert R. Bent* of *Zuccaro, Willis & Bent*, St. Johnsbury, for Defendant-Appellant.

*Robert Appel*, Defender General, Montpelier, for Amicus Curiae Office of Defender General.

**Morse, J.** Defendant Christopher Bacon appeals his conviction of being an accessory to the murder of Robin Colson, committed during a burglary of her residence in Newfane, as well as seventeen other convictions associated with the murder. As a result of the felony-murder conviction, he was sentenced to life imprisonment without parole. Defendant claims error in the jury instructions; he also contends that he was denied effective assistance of counsel, and that his confession was involuntary and was taken in violation of his *Miranda* rights. We reject defendant's ineffective-assistance-of-counsel and *Miranda* arguments, but reverse his murder conviction because of error in the instructions; the other seventeen convictions are affirmed.

## I.

On April 8, 1991, defendant and Charles Gundlah, both inmates at the Woodstock Correctional Facility, escaped together from a correctional work crew. The men made their way to Newfane, where they broke into unoccupied seasonal camps over the next few days and found food and lodging. Following his arrest, defendant related the circumstances surrounding Colson's death to police in a tape-recorded statement that was presented as evidence at his trial. The statement provided the following version of how the murder occurred.

In one camp they had broken into, the men found and read a neighborhood watch directory, which indicated that Colson lived alone in the area year-round. They then formulated a plan to steal Colson's car. The plan contemplated that defendant would enter the house and brandish a metal bar in order to intimidate Colson. On April 12, the

men went to Colson's house, Gundlah carrying a knife and defendant the metal bar.

After arriving at the house, however, defendant became skittish over the robbery. Gundlah reacted by exchanging the knife for the metal bar defendant was carrying. According to defendant, Gundlah then went into the house and closed the front door. When defendant entered the house a few moments later, he saw Gundlah strike Colson on the head with the bar, and then, when Colson was on the floor, place the bar over her throat and stand on it. At Gundlah's direction, defendant closed off Colson's dogs in another room. Colson made some noise and Gundlah urged defendant to stab her. When defendant declined, Gundlah grabbed the knife from his hands and stabbed Colson to death. Thereupon, the men stole money from Colson's purse and cleaned up blood stains. They later stole an ATV from a nearby camp to transport the body into the woods, where they dug a grave. After disposing of the body, they returned to Colson's house and took her car.

The two men drove Colson's car to Massachusetts. After abandoning the car, they returned to Vermont several days later with defendant's former girlfriend, April Coldwell. Defendant and Gundlah were arrested in Rutland when a police officer was summoned to assist Coldwell after she locked her keys in her car.

## II.

Claiming he harbored no murderous intent, defendant argues that the court erred by instructing the jury that he could be convicted based solely upon Gundlah's murderous intent.

## A.

At the outset, we note that defendant's objection to the intent instruction was not properly preserved because it was not specifically renewed after the charge. See V.R.Cr.P. 30 (to preserve claim of error, party must object "before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection"); see State v. Pelican, 160 Vt. 536, 538, 632 A.2d 24, 26 (1993) (objection following instructions is necessary to preserve issue for appeal). The State has not argued that defendant failed to make a proper objection to the instruction. This is not surprising, considering that the objection to the charge briefed by defendant on appeal (1) is precisely the same objection that he repeatedly raised throughout

pretrial hearings, including the charge conference, and (2) was the focus and the heart of his principal defense at trial — that Gundlah killed Colson and that defendant did not intend to harm her. Further, although defendant failed to restate his objection to the intent instruction before the jury retired, the court indicated at a short bench conference immediately following the charge that it was preserving "all prior objections to the jury instructions."

In an opinion issued two weeks before the present case was given to the jury, we ruled in a similar situation that an objection raised *before* the jury charge would be considered preserved, but cautioned that the trial court's advice was contrary to Rule 30 and that objections should be renewed on the record after the charge is given to the jury. See *State v. Wheelock*, 158 Vt. 302, 306, 609 A.2d 972, 975 (1992). Here, in light of defendant's repeated specific objection to the challenged instruction, the trial court's statement that all objections would be preserved, and the temporal proximity of this case to *Wheelock*, fairness dictates that we consider preserved defendant's objection to the charge. Notwithstanding *Wheelock*, we would be reluctant to affirm defendant's murder conviction upon concluding that the instruction was erroneous; as noted, the challenged instruction went to the heart of the defense in this case and, thus, would have to be considered exceedingly prejudicial. See *Pelican*, 160 Vt. at 538-39, 632 A.2d at 26 (plain error doctrine); cf. *State v. Percy*, 158 Vt. 410, 418, 612 A.2d 1119, 1125 (1992) (erroneous instruction allowing conviction of kidnapping based on constructive knowledge of confinement was not plain error where there was no serious dispute over whether defendant had intended to confine victim).

The dissent states that we are acting inconsistently by reviewing defendant's argument as preserved because in *Pelican* we rejected an identical request for fairness even though the trial in that case preceded our decision in *Wheelock*. We disagree. In *Wheelock*, we cautioned that the trial court's preservation of all prior objections was contrary to Rule 30, but we did not hold that in the future counsel could not rely on such advice to preserve objections to the charge. Further, the trial court in *Pelican* did not preserve all prior objections, as was done in this case. In *Pelican*, the defendant failed to renew his objection after the charge was given. On appeal, he argued that his objection should be considered preserved because *Wheelock* was decided after the trial in that case. We pointed out that Vermont law had always required an objection after the charge, *Pelican*, 160

Vt. at 538, 632 A.2d at 26, but said nothing about preservation of objections in cases where the trial court informed the parties that all objections would be preserved. In short, nothing we said in *Pelican* contradicts what we are doing here. We now state, however, that in the future parties may not rely on the trial court's advice that all objections raised at the charge conference will be preserved.

## B.

We now return to the substance of defendant's argument. Defendant challenges the following portions of the jury charge relating to accomplice liability and felony murder:

> A person is liable for the acts of his accomplice when two or more persons combine under a common understanding, and with a common purpose, to do an illegal act. Each of those persons is held criminally responsible for the acts of each and all who participate in the execution of the unlawful design. The prosecution must prove that the illegal common purpose existed and that one of the participants in the illegal plan committed the murder of Robin Colson during the alleged attempt or perpetration of the illegal plan to burglarize her dwelling. *The defendant is liable for the acts of his accomplice, Charles Gundlah, even if you find that Gundlah departed from the illegal plan which they had previously made so long as Gundlah's acts were incidental to the execution of or as a natural and probable consequence of their original plan, and in furtherance of their alleged common purpose.*
>
> To find a common plan of the defendant and Mr. Gundlah to break into Robin Colson's home, overcome any resistance met, and to commit a larceny, such plan must be proved beyond a reasonable doubt. The mere presence of the defendant at the scene is not enough, unless it is also proved beyond a reasonable doubt that the defendant procured or incited or encouraged Mr. Gundlah in the performance of the plan.
>
> For the State to prove the defendant guilty, you must also find beyond a reasonable doubt that he participated in that illegal common plan, and that he would render assistance to Charles Gundlah if that became necessary. The common plan may be . . . proved by an express agreement between

the defendant and Charles Gundlah, or by circumstantial evidence of an implied understanding, or both.

. . . .

The State must also prove beyond a reasonable doubt that the defendant or Charles Gundlah as part of their common plan, or both of them are the person or persons who, in fact, caused the death of Robin Colson.

The term willful as it is used here requires the State to prove that the killing of Robin Colson was done not by accident, but with intent to kill. Willful means intentional. In other words, you must find that the defendant *or Mr. Gundlah* or both of them as part of or incident to the alleged illegal plan, *intended to kill* Robin Colson, and that the killing did not happen by mistake.

. . . .

The term aforethought, as used with malice, means that the defendant *or Charles Gundlah* or both of them as part of a common plan, *formed legal malice* prior to acting against Robin Colson with evil or unlawful intent in the manner alleged. . . .

You may find malice from evidence that the defendant *or Mr. Gundlah* or both of them as part of the alleged plan intentionally set in motion a chain of events likely to cause death or great bodily injury to Miss Colson, or acted under the alleged plan with extreme indifference to the value of human life.

(Emphasis added.)

■ These instructions permitted the jury to convict defendant of being an accomplice to felony murder even if he neither intended to kill or cause great bodily harm to Colson nor acted with extreme indifference to human life, so long as Gundlah possessed any of these mental states. Because the instructions improperly allowed the jury to impute defendant's mental state with respect to the murder based solely on its determination that Gundlah harbored the requisite intent, his conviction must be reversed. Accord *Clark v. Jago*, 676 F.2d 1099, 1106 (6th Cir. 1982) (jury instruction allowing accomplice to be convicted of felony murder if either he or principal had requisite mental state violated due process).

## 1.

We begin by addressing the accomplice-liability rule rather than the felony-murder doctrine. See 2 W. LaFave & A. Scott, Substantive Criminal Law § 7.5, at 211-12 (1986) (in felony-murder cases involving co-felons, whether one co-felon is liable for acts of another "is not so much a matter of felony murder as a matter of parties to crime"). The leading case on accomplice liability, and the apparent source of the court's instruction, is *State v. Orlandi*, 106 Vt. 165, 170 A. 908 (1934). In that case, a group of men waylaid a granite worker named Rigg on his drive home from work in order to "encourage" him either to join their striking union or to stop working. During an ensuing melee, one of the men, Orlandi, struck Rigg. All of the waylayers were charged with assault, although only Orlandi was identified as having struck Rigg. Finding that there was ample evidence to show that the defendants' "purpose in setting out to stop [Rigg] was not peaceably to persuade him to stop work and join the union, but was to compel him by force and intimidation to accede to their demand," this Court held that all the defendants could be found guilty of assault because Orlandi's act was within the parameters of their "common design to perform an illegal act." *Id.* at 172, 170 A. at 911.

In support of this holding, the Court stated that "[w]here several persons combine under a common understanding and with a common purpose to do an illegal act, every one is criminally responsible for the acts of each and all who participate with him in the execution of the unlawful design." *Id.* at 171, 170 A. at 910. We have quoted this language in numerous cases over the years as the general rule in Vermont on accomplice liability. E.g., *State v. Gilman*, 158 Vt. 210, 216, 608 A.2d 660, 664 (1992); *State v. Davignon*, 152 Vt. 209, 215, 565 A.2d 1301, 1304-05 (1989); *State v. Polidor*, 130 Vt. 34, 36, 285 A.2d 770, 772 (1971); *State v. Ballou*, 127 Vt. 1, 4, 238 A.2d 658, 661 (1968); *State v. Barr*, 126 Vt. 112, 122, 223 A.2d 462, 469-70 (1966); see also *State v. Brown*, 147 Vt. 324, 326, 515 A.2d 1059, 1061 (1986) (stating same general rule without quoting *Orlandi* language).

*Orlandi* also included the following language, which was roughly paraphrased by the trial court herein in the challenged instruction on accomplice liability:

> So, when the evidence is sufficient to enable the jury to find beyond a reasonable doubt that several persons have formed a common design to assault another, and are present for that purpose at the place agreed upon for the commission of the

offense, each one is criminally responsible for the acts of the others in the prosecution of the design, *and for everything done by any one of them which follows incidentally in the execution of the design as one of its natural consequences, even though it was not intended as a part of the original plan.*

106 Vt. at 171-72, 170 A. at 910-11 (emphasis added). The underlined language had no impact in *Orlandi* because, as the Court noted, the charged conduct in that case was within the scope of the defendants' intended plan. *Id.* at 172, 170 A. at 911. The language has never since been employed by this Court.

■ To the contrary, we have repeatedly held that a defendant can be convicted as an accomplice "only if he acted with the same intent as that required for" the principal perpetrator of the crime. *Davignon*, 152 Vt. at 215, 565 A.2d at 1304; see *State v. Wood*, 143 Vt. 408, 411, 465 A.2d 1372, 1374 (1983) (to hold defendant liable as accomplice, State must show that defendant knowingly and intentionally participated to some substantial measure in commission of common criminal objective); *State v. Carter*, 138 Vt. 264, 268, 415 A.2d 185, 187 (1980) (same); cf. *State v. Miller*, 146 Vt. 164, 175-76, 502 A.2d 832, 839 (1985) (where court instructed jury that State must prove defendant killed victim with malice, and evidence was sufficient for jury to conclude that defendant participated in murder with his co-felon, court did not err by failing to instruct jury that common plan of defendant and co-felon must have been to kill victim, not merely to rob him).

■ Accordingly, we are not persuaded by the dictum in *Orlandi* that is quoted and underlined above. The language violates one of the most basic principles of criminal law by allowing the jury to convict a person for causing a bad result without determining that the person had some culpable mental state with respect to that result. *State v. Doucette*, 143 Vt. 573, 580, 470 A.2d 676, 681 (1983); see *United States v. Powell*, 929 F.2d 724, 727 (D.C. Cir. 1991) (rejecting "natural and probable consequences" standard and adopting standard that "puts the accomplice on a level with the principal, requiring the same knowledge for both"); *United States v. Greer*, 467 F.2d 1064, 1069 (7th Cir. 1972) ("Accomplice liability is necessarily limited by the general principles of criminal liability."); 2 W. LaFave & A. Scott, *supra*, § 6.7(c), at 144, and § 6.8(b), at 158 (prevailing view is that accomplice must have mental state required for charged offense in order to be

convicted on accomplice theory; natural and probable consequences rule "is inconsistent with more fundamental principles of . . . criminal law").

■ On the other hand, the oft-quoted "common purpose" language stated in *Orlandi* remains viable because it permits the conviction of a person as an accomplice only when the person participated in the execution of the unlawful act under a common understanding or purpose, which is equivalent to requiring the requisite mental state. See *State v. Bushey*, 137 Vt. 155, 159, 400 A.2d 993, 996 (1979) (phrases "common understanding" and "common purpose" are sufficient "to inform the jury that the element of intent must be common to all, even though the individual activities in furtherance of the criminal object may make only a partial or fractional contribution to the carrying out of the total purpose").

■ We recognize that 13 V.S.A. § 3, which provides that "[a] person who aids in the commission of a felony shall be punished as a principal," does not include an intent element. We have no difficulty, however, holding that there is an implied element of intent in the statute. See *State v. Beayon*, 158 Vt. 133, 135, 605 A.2d 527, 528 (1992) ("We have often implied guilty intent as an element when none was expressly provided by the statute."). The purpose of the accomplice-liability rule is not to permit the conviction of participants to a crime who never intended a co-felon to commit the acts in fact committed. Rather, the rule is intended to allow the conviction of defendants who intended to, and did in fact, aid in the commission of the charged offense, but who were not the primary perpetrators of the crime or did not participate in every aspect of the planned illegal act. See, e.g., *State v. Bissonette*, 145 Vt. 381, 390-91, 488 A.2d 1231, 1236-37 (1985) (where evidence was more than sufficient for reasonable jury to conclude that defendant planned to separate victims from their money by unlawful means, judgment of acquittal on false pretenses charge was not required merely because only defendant's accomplice, not defendant, actually received money); *State v. Bristol*, 143 Vt. 245, 251, 465 A.2d 278, 281 (1983) (State did not have to prove which participant in a preconceived criminal plan fired the fatal shot because the acts of each are attributable to the other); *Polidor*, 130 Vt. at 36, 285 A.2d at 771-72 (even though State failed to show defendant set fire, he could be convicted on arson charge based on his role in planning illegal act).

## 2.

We now consider the relationship between the accomplice-liability rule and the felony-murder doctrine. One of the few areas of criminal law in which courts once applied the "natural and probable consequences" rule of accomplice liability without controversy was in felony-murder cases under the early common law. 2 W. LaFave & A. Scott, *supra*, § 6.7, at 145, and § 6.8, at 159. Because the common-law felony-murder doctrine imputed an intent to murder if a homicide occurred — even accidentally — during the perpetration of a felony, it was appropriate to hold that complicity in the underlying felony should likewise suffice to establish guilt for the murder itself. *Id.*

Felony murder in Vermont, however, does not presume liability for all fatal consequences stemming from the underlying felony; rather, only murderous consequences are punished. 13 V.S.A. § 2301 ("murder" committed during perpetration of enumerated felonies shall be first-degree "murder"); *Doucette*, 143 Vt. at 581, 470 A.2d at 682 (legislature limited doctrine to *murders*, not *killings*). Citing the basic principle that a person should not be convicted of a crime for which he does not possess the requisite intent, this Court held in *Doucette* that a jury may not convict a person of felony murder unless it finds, beyond a reasonable doubt, that the person had an intent to kill, an intent to do great bodily harm, or a wanton disregard of the likelihood that death or great bodily harm would result. 143 Vt. at 582, 470 A.2d at 682. Thus, the mere showing that a person intended to commit one of the felonies enumerated in § 2301 is insufficient to convict the person of felony murder; at minimum, the prosecution must show a mental state of wanton disregard for human life with respect to the murder itself. On the other hand, because of the dangerous nature of the enumerated felonies, the State is not required to show intent to kill in felony-murder cases. In effect, § 2301 increases the punishment for felony murders that otherwise might have been only second-degree murders because of the absence of an intent to kill.

Allowing an accessory to an underlying felony to be convicted of felony murder on anything less than a wanton and reckless disregard for human life, however, would be inconsistent with *Doucette*'s construction of § 2301, which was intended to mitigate the harshness of the common-law felony-murder rule. Like Vermont, Michigan has abrogated the common-law concept of felony murder. Michigan's felony-murder statute is similar to Vermont's and, like Vermont's, is

limited to murders committed in the perpetration of enumerated felonies. Compare Mich. Comp. Laws Ann. § 750.316 (West 1991) (murder committed during perpetration or attempt to perpetrate arson, rape, robbery, burglary, larceny, or kidnapping is first-degree murder) with 13 V.S.A. § 2301 (murder committed during perpetration or attempt to perpetrate arson, robbery, burglary, sexual assault or aggravated sexual assault is first-degree murder). With respect to the vicarious liability of co-felons, the Michigan Supreme Court has stated that "the individual liability of each felon must be shown [] [because it] is fundamentally unfair and in violation of basic principles of individual criminal culpability to hold one felon liable for the unforeseen and unagreed-to results of another felon." *People v. Aaron*, 299 N.W.2d 304, 327 (Mich. 1980).

We agree, and hold that to convict a defendant as an accomplice to felony murder, the prosecutor must prove that the defendant possessed both the intent to commit the underlying felony as well as one of the three mental states required to convict the principal perpetrator of felony murder. Accord *People v. Flowers*, 477 N.W.2d 473, 478 (Mich. Ct. App. 1991); cf. *Davignon*, 152 Vt. at 215, 565 A.2d at 1304 (approving jury instructions stating that accomplice could be convicted only if he acted with same intent as required for principal). The mere fact that a defendant's conduct makes him an accomplice to the commission of the underlying felony does not necessarily show that he is also an accomplice to the felony murder. Cf. *United States v. Jones*, 678 F.2d 102, 105 (9th Cir. 1982) (where defendant is charged with aiding and abetting crime involving element that enhances offense, State must prove defendant participated in both elements of crime).

Although the State must prove the requisite intent of each participant in a felony murder with regard to the murder as well as the underlying felony, the jury may infer such intent from circumstantial evidence. See *Aaron*, 299 N.W.2d at 327 (jury may infer mental element of murder from nature of, and circumstances surrounding, underlying felony); *Commonwealth v. Bachert*, 453 A.2d 931, 935 (Pa. 1982) (accomplice may be convicted only of crime for which he harbored requisite mental state, but existence of shared criminal intent may be inferred from all attendant circumstances); see also *Carter*, 138 Vt. at 269, 415 A.2d at 188 (accomplice liability may be established by inference that presence at scene of crime was by common design); *State v. Persuitti*, 133 Vt. 354, 357, 339 A.2d 750,

752 (1975) (weapons carried by assailants circumstantially corroborated evidence that there was common understanding to use whatever force necessary during robbery; therefore, jury could have found that defendant, who did not participate in beating, intended to commit aggravated assault). Though we are compelled to reverse defendant's conviction because the court's charge permitted the element of intent as to Colson's murder to be found in either the defendant or his accomplice, we do not suggest that defendant may not have harbored the intent required to convict him of felony murder. Cf. *Jago*, 676 F.2d at 1106 (reversal based on erroneous jury instruction permitting element of culpability to be found in defendant or accomplice does not necessarily imply that evidence in record of accomplice's intent was insufficient). If defendant acted with, at minimum, extreme indifference to the value of human life, the mental element of felony murder would be satisfied. The instructions should have said as much, but they did not.

## III.

Defendant also argues that the trial court erred by not suppressing his confession because (1) it was not voluntarily given, (2) the *Miranda* warnings he received were equivocal, and (3) the police obtained his confession after he invoked his right to remain silent during the interrogation. The second and third arguments are raised for the first time on appeal, but we address them because they could come up again if defendant is retried.

## A.

Defendant first contends that the two police officers who interrogated him used cajolery and trickery to overcome his will. According to defendant, the officers played upon his fear of becoming the "fall guy," implied that Gundlah had implicated him by falsely stating that they had talked to Gundlah, exaggerated the difference in punishment that might be imposed on an accomplice rather than a principal to the murder, and focused on whether the murder was premeditated in order to mislead defendant into thinking the punishment would be much less severe if the murder were not premeditated.

"[I]t is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect." *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986). Even if such tactics play a part in the suspect's decision to confess, the confession is voluntary so

long as the "decision is a product of the suspect's own balancing of competing considerations." *Id.* The question, then, is not whether statements made by the interrogators were the cause of defendant's confession, but rather "whether those statements were so manipulative or coercive that they deprived [defendant] of his ability to make an unconstrained, autonomous decision to confess." *Id.*; see *State v. Zehner*, 142 Vt. 251, 254, 453 A.2d 1126, 1127 (1982) (ultimate question is whether police conduct or tactics caused defendant's will to be overborne and his capacity for self-determination to be critically impaired). The trial court must examine the totality of the circumstances in assessing the voluntariness of defendant's confession, and we will not disturb that assessment unless it is clearly erroneous. *State v. Roberts*, 160 Vt. 385, 388, 631 A.2d 835, 837 (1993).

After reviewing the transcripts of the voluntariness hearing and the taped interrogation, we agree with the trial court that the totality of the circumstances demonstrates that defendant's statement to police was the product of his own free will. The interview lasted approximately one and one-half hours. Defendant had eaten and he was not handcuffed. At the start of the interview, before reading defendant his rights, the officers informed him that he was suspected of murdering Robin Colson. The officers encouraged defendant not to take the fall for Gundlah. They did mention, apparently falsely, that they had talked to Gundlah, but they never stated what Gundlah purportedly said to them, and defendant's responses did not indicate any concern about the officers' isolated remarks. Cf. *Miller*, 796 F.2d at 607 (defendant's impassive reaction indicated that officer's lie regarding time of victim's death did not constitute sufficient trickery to overcome defendant's will).

Further, the officers' suggestions that defendant's limited role in the murder or the absence of premeditation might reduce the offense or the sentence did not appear to have had much effect on defendant, whose only hesitation in providing details of the murder stemmed from his concern about the consequences of implicating Gundlah. In any case, predictions such as these rarely are viewed as sufficiently coercive to render a confession involuntary, absent a showing that the suspect's will was overborne. See *Roberts*, 160 Vt. at 388-89, 631 A.2d at 837 (police prediction that a statement by defendant might result in reduced bail was not sufficiently coercive to render subsequent confession involuntary); *State v. Benton*, 759 P.2d 332, 334-35 (Or. Ct. App. 1988) (officer's psychological technique of

minimizing defendant's acts did not interfere with defendant's exercise of his free will).

### B.

Next, defendant argues that because the officer who read the *Miranda* warnings referred to them as "technicalities," he was not advised of his right to remain silent in clear and unequivocal terms. The officer stated, "Before we go any further, we have some technicalities we have to abide by and I'm going to read you your rights, okay?" Although we do not approve of the officer's use of the term "technicalities," there is no suggestion here that defendant was unaware of the significance of the rights that were read to him. The warnings were stated to him in plain language. Defendant, who had had his rights read to him on at least one prior occasion, indicated that he understood each right. In response to the final question, "Having these rights in mind, do you want to talk to me now?", defendant responded, "It doesn't matter. Yes, I'll talk to you." We cannot conclude that the mere mention of the word "technicalities" rendered the reading of the rights equivocal.

### C.

Finally, defendant argues that the interrogating officers violated his *Miranda* rights by continuing to question him even after he repeatedly invoked his right to remain silent. See *State v. Mosher*, 143 Vt. 197, 203, 465 A.2d 261, 264 (1983) (interrogation must cease if defendant indicates in any manner prior to or during questioning that he wishes to remain silent). We reject this argument. The United States Supreme Court has recently held that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, — U.S. —, —, 114 S. Ct. 2350, 2356 (1994). The Court expressly declined to adopt a rule requiring officers to ask "clarifying questions" when a suspect makes an ambiguous or equivocal request for counsel. *Id.* If the suspect's statement is an ambiguous or equivocal request for counsel, "the officers have no obligation to stop questioning him." *Id.* Without doubt, this holding applies equally to situations in which a defendant who has waived his *Miranda* rights ambiguously invokes the right *to remain silent* during the subsequent interrogation. See *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994) (*Davis* rule applies equally to invocations of right to remain silent).

Here, during the interrogation, defendant repeatedly expressed fear of reprisals if he named Gundlah as the perpetrator of the murder. When asked questions in which he would have to indicate who murdered the victim, defendant hesitated, stating that he feared what might happen to him if he said anything. On a couple of occasions, defendant made statements such as, "I can't get myself to say anything." These statements indicate the internal struggle that defendant was going through — whether to tell his side of the story and be marked as a "snitch," or whether to keep quiet in the face of a murder charge and the substantial evidence against him. At one point, defendant rhetorically asked, "So, do I chance getting killed or doing life imprisonment?" Eventually, he decided to speak, stating, "I know this is against my better judgment. I'll tell you what happened."

Although defendant clearly indicated that he had doubts about naming Gundlah as the murderer, he never clearly expressed a desire to stop talking and end the interrogation. A defendant may express an unwillingness to discuss certain subjects without indicating a desire to terminate an interrogation already in progress. *People v. Silva*, 754 P.2d 1070, 1083, 247 Cal. Rptr. 573, 586-87 (1988) (defendant's statement, "I really don't want to talk about that," did not constitute invocation of right to remain silent); *Commonwealth v. Roberts*, 555 N.E.2d 588, 590 (Mass. 1990) (defendant's refusal to reply to certain questions did not indicate his desire to end interrogation or to invoke his right to remain silent); *People v. Spencer*, 397 N.W.2d 525, 528 (Mich. Ct. App. 1986) (defendant's assertion that he wanted to limit his answers was not invocation of right to remain silent). We conclude that defendant's hesitation to provide information that would inculpate Gundlah was not sufficiently direct or emphatic to constitute an invocation of his right to remain silent, and thus the officers were not obligated to cease the interrogation.

## IV.

Although we reverse the murder conviction based on the court's instruction on intent, we address defendant's ineffective-assistance-of-counsel claim because that claim necessarily challenges all of his convictions. Ordinarily, we do not address such claims on direct appeal, but we do so here because the claim was raised and adjudicated before trial. See *In re Moskaluk*, 156 Vt. 294, 298, 591 A.2d 95, 97 (1991) (ineffective-assistance-of-counsel claim will not be considered on direct appeal absent trial court record upon which

claim can be judged). Defendant contends that the State's failure to pay defense counsel in a timely manner for expenses and services in connection with this case created a conflict of interest by forcing counsel to choose between his family's financial welfare and his loyalty to his client, thereby denying defendant effective assistance of counsel. We conclude that defendant has failed to show that the alleged conflict of interest compromised trial counsel's loyalty to defendant, adversely affected his performance, or imperiled defendant's right to a fair trial. Therefore, we reject this claim of error and affirm all of the convictions other than the murder conviction.

## A.

The following is a summary of the events surrounding defendant's claim. In July 1991, trial counsel agreed to take defendant's case. He knew compensation was set at $25.00 per hour, but he was under the impression that the case involved a single count of first-degree murder. After becoming aware of the scope of the case, trial counsel talked to the assigned-counsel coordinator, who advised him that he could seek co-counsel and could apply for excess payment for the entire case. The coordinator also approved trial counsel's proposal that he receive incremental $1,000 payments as services were provided and expenses incurred. In December 1991, however, the Defender General informed trial counsel that the State would be unable to make the $1,000 incremental payments because the budget for ad hoc counsel had been exhausted for the fiscal year.

On December 12, 1991, trial counsel moved to withdraw from the case and moved, on behalf of defendant, for dismissal of the charges because of an alleged deprivation of defendant's right to counsel. A two-day evidentiary hearing was held on the motions in January 1992; a number of lawyers testified on behalf of trial counsel. Most of the testimony amounted to a general attack on the adequacy of the State's method and rate for compensating assigned counsel. Trial counsel presented no evidence regarding his own personal or office finances in support of his claim that the Defender General's failure to pay him had created a conflict of interest by compromising his loyalty to his client. Further, no evidence was forthcoming on how the lack of funding had compromised defendant's right to a fair trial or counsel's preparation of the defense.

After a thorough analysis of the right to counsel and the professional and ethical responsibilities of counsel, as well as the State's obligations under the Vermont Constitution and the Public Defender

Act, the court denied the motions in a February 1992 decision. The court found that all of the deposition expenses in the case had been paid, but that the State owed trial counsel approximately $4,000 for services rendered up through that time. It ordered that trial counsel obtain approval for defense expenses and submit vouchers for the expenses to the Defender General's office, and that defense counsel was to be compensated for the expenses no later than thirty days after submission of the vouchers. It further ordered counsel to submit a debenture for all of his uncompensated time, which was to be paid in thirty days. Contrary to the court's order, for reasons not stated on the record, trial counsel was not paid until May 11, 1992. Apparently, trial counsel made no further effort to resolve the issue of timely compensation, apart from appealing the order denying his motions to withdraw as defendant's counsel and to dismiss defendant's case.

Meanwhile, another problem developed regarding trial counsel's attempt to retain an expert witness to challenge the admission of DNA evidence indicating that blood found on defendant's pants belonged to Colson. In late January 1992, trial counsel obtained a fee estimate from a potential expert witness. The assigned-counsel coordinator refused to pay the expert's demanded rate and suggested a counteroffer, which was rejected. In response to a motion by defense counsel, the court ordered the State to pay the expert's fee, but by this time, the expert had refused to provide the services, and trial counsel was unable to locate another expert witness. Trial counsel did not cross-examine the prosecution's experts at the hearing on the admissibility of the DNA evidence, and the court granted the prosecution's motion to admit the evidence.

### B.

Based on the above facts, defendant claims that he was deprived of effective assistance of counsel by being forced to stand trial while represented by an attorney who had a conflict of interest because of the State's failure to make timely and adequate payments for defense services. He contends that the conflict of interest resulting from the lack of funds creates a presumption of prejudice requiring reversal. He points out that there is some uncertainty under United States Supreme Court decisions whether reversal is automatic upon a showing of a *potential* conflict of interest, or whether he must show that an *actual* conflict of interest adversely affected his attorney's performance, but he contends that in either case he has made a sufficient showing. We conclude that defendant was required, but

failed, to show that the alleged conflict jeopardized his right to a fair trial.

In *Holloway v. Arkansas*, 435 U.S. 475 (1978), an attorney representing three codefendants filed a pretrial motion for separate counsel after concluding, based on confidential information received from one of his clients, that he was confronted with the risk of representing conflicting interests. The trial court denied the motion. On appeal, the Supreme Court held that the defendants had been deprived of effective assistance of counsel by the trial court's failure either to appoint separate counsel or to take adequate steps to ascertain whether the risk posed by having one attorney represent all three defendants was too remote to warrant separate counsel. *Id.* at 484. The Court noted that, although defense counsel had made certain representations regarding the probable risk of a conflict of interest, "the trial judge cut off any opportunity of defense counsel to do more than make conclusory representations." *Id.* at 484 n.7. The Court held that "whenever a trial court improperly requires joint representation over timely objection," reversal is mandated without any showing of prejudice. *Id.* at 488.

Thus, *Holloway* requires automatic reversal by reviewing courts in conflict-of-interest cases only where the trial court fails to give the defendant an "opportunity to show that potential conflicts impermissibly imperil his right to a fair trial." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). "[U]nless the trial court fails to afford such an opportunity, a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel." *Id.*; see *United States v. Burney*, 756 F.2d 787, 791 (10th Cir. 1985) (Sixth Amendment requires automatic reversal only when trial court fails to conduct inquiry after either timely objection or when it knows particular conflict exists).

Here, the trial court held an evidentiary hearing in which defense counsel had ample opportunity to show that the alleged conflict of interest impermissibly imperiled defendant's right to a fair trial. Nevertheless, other than his statement that his representation of defendant was hurting his family, trial counsel offered no evidence that his loyalty to defendant or his ability to prepare a defense was compromised by the compensation he did or did not receive for his services. He submitted no evidence of his office or personal finances, or of the hours he was spending on this case and other cases, to demonstrate the existence of an overbearing conflict that might overcome an attorney's duty of loyalty to clients. There was no

evidence that trial counsel's representation of defendant was causing cash-flow problems, or that he had attempted to alleviate any such problem by means other than withdrawing as counsel, such as obtaining an office loan. There was no evidence that trial counsel neglected this case or that he was forced, out of financial necessity, to spend less time on this case than he should have spent. He made no attempt to show specifically how the State's failure to pay him in a timely manner limited his preparation of his client's defense.

█ In short, rather than attempting to show the potential conflict had some effect in this particular case, trial counsel and his witnesses generally attacked the State's system for compensating assigned counsel. This was insufficient to meet defendant's burden. See *State ex rel. Stephan v. Smith*, 747 P.2d 816, 831 (Kan. 1987) (simply because system *could* result in appointment of ineffective counsel is not sufficient reason to declare system unconstitutional; rare cases where counsel has been ineffective must be handled individually); *State v. Wigley*, 624 So. 2d 425, 427 n.1 (La. 1993) (issue of compensation for appointed counsel does not necessarily implicate rights of criminal defendant; "determinations of the adequacy of representation must be made independently from decisions on attorney compensation"); *Clark v. State*, 831 P.2d 1374, 1376 (Nev. 1992) (whether actual conflict exists must be evaluated on specific facts of each case). Defendant cannot prevail on an ineffectiveness claim based solely on trial counsel's unsupported contention that his dissatisfaction with the compensation he received created a conflict of interest.

We disagree with the dissent's suggestion that the court implicitly found in its February 1992 order that there was an actual conflict of interest that imperiled defendant's rights. While the trial court acknowledged in its findings that, in general, the compensation for assigned counsel is insufficient to cover office overhead, this finding and other findings noted by the dissent cannot be transformed into a finding that the alleged conflict of interest either adversely affected trial counsel's performance or imperiled defendant's right to a fair trial. Further, although the court stated that the lack of funds in the case "hinders" the effective assistance of counsel, the court made this general statement in the remedy section of the decision, apparently to bolster its order requiring the Defender General to make timely payments to trial counsel. Even if we were to view this statement as a finding, it has no support in the record beyond a theoretical surmise.

In fact, the trial court made no explicit findings on the existence or effect, if any, of the alleged conflict of interest. The thrust of its order denying the motions to withdraw and to dismiss, however, was to reject defendant's argument that he was being deprived of his rights and to assure that those rights would not be imperiled in the future by requiring, in part, that trial counsel be paid the cash advances he had negotiated with the State. Cf. *Holloway*, 435 U.S. at 484 (when defense counsel claims conflict of interest has resulted from multiple representation of codefendants, trial judge must either appoint separate counsel or take adequate steps to ascertain whether risk was too remote to warrant separate counsel). This was a reasonable order in light of (1) trial counsel's consent to take the case if the State provided incremental cash payments, and (2) trial counsel's failure to provide evidence to support the existence of the conflict of interest alleged in this case.

To the extent defendant argues that the February 1992 order was inadequate to protect his rights because the measures the court imposed were never followed, defendant has failed to preserve that argument. Trial counsel did not renew his motions to withdraw or to dismiss based on the failure of the court's February 1992 order to protect defendant's rights. At a March 17, 1992 hearing on defendant's motion for permission to appeal, the attorney for the State pointed out that the Defender General had transferred $1500 to the judiciary's budget for the purpose of compensating defendant's DNA expert, and suggested that the Defender General might still, if he had not already done so, compensate defense counsel for expenses and services within the forty-day time frame provided in the court's February 26 order. The state's attorney stated that he did not know if trial counsel had submitted to the Defender General's office his debenture for uncompensated services, as the court's order required, but apparently defense counsel sent a copy of the debenture and a breakdown of expenses to the court on March 6. Trial counsel did not respond to the state's attorney's comments, though the court specifically asked him if he had anything to add. On April 6, 1992, the day trial was to begin, defense counsel moved for the trial judge to recuse himself based on the contents of an article in that morning's local newspaper. During trial counsel's argument, he briefly mentioned that he continued to believe that he could not adequately represent defendant because of the lack of resources. Although trial counsel stated that he had not yet been paid for his services, he did not state that he had followed the court's order and been rebuffed. In short,

trial counsel had ample opportunity to file further motions and to make a record regarding the failure of the court's order to protect defendant's rights, but he did not do so. Considering that defendant never sought dismissal based on the failure of the trial court's order to protect his rights, he has the burden to show on appeal that the absence of payments to trial counsel under the court's February 1992 order created an actual conflict of interest that adversely affected his counsel's performance. See *Cuyler*, 446 U.S. at 348 (to establish Sixth Amendment violation, defendant who raised no objection at trial must demonstrate that actual conflict of interest adversely affected attorney's performance). He has failed to make such a showing.

The dissent makes much of the fiasco surrounding trial counsel's attempts to obtain a DNA expert. Because defense counsel's problems in obtaining such an expert did not surface until after the court heard the motions to dismiss and to withdraw as counsel, the court did not address those problems in its order regarding those motions, and defendant does not discuss the DNA issue on appeal. In any event, we do not agree with the dissent's characterization of the admissibility of the DNA evidence as "the major legal issue of the case." Defendant's principal defense was that Gundlah killed Colson, and that defendant never intended to harm her. Defendant conceded in an admissible confession that he was present at the scene of the crime and that he had helped Gundlah dispose of the victim's body. Given his admissions, it is difficult to see how proof that some of Colson's blood wound up on his pants could have impaired his defense. Furthermore, defendant does not suggest that the DNA evidence concerned any charged offense other than the murder itself, and we are reversing the murder conviction on other grounds.

*Defendant's murder conviction is reversed; all other convictions are affirmed. The case is remanded for further proceedings.*

**Allen, C.J.,** concurring and dissenting. I concur in the majority's opinion affirming the denial of defendant's motion to suppress and its determination that defendant's right to counsel was not violated. I dissent from the determination that the jury instruction issue was preserved.

While I believed and still believe that *State v. Wheelock*, 158 Vt. 302, 609 A.2d 972 (1992), was wrongly decided, it clearly and unequivocally stated that in all future cases "a succinct recitation of specific itemized" objections must be placed on the record following the instructions to the jury, and that the failure to do so is a waiver of an error even if the substance of the objection is made known before the

charge. *Id.* at 306, 609 A.2d at 975. This case illustrates the mischief *Wheelock* created, but I am unaware of any exception to the doctrine of stare decisis which would permit us to deviate from *Wheelock*'s clear dictate.

I would affirm on all issues.

**Dooley, J.,** concurring and dissenting. I concur in the majority's decision affirming the denial of defendant's motion to suppress his confession. I respectfully dissent from the majority's determination that there was no violation of defendant's right to counsel in this case. I would reach the jury charge issue only to hold it was not preserved as required by V.R.Cr.P. 30.

With respect to the jury charge issue, the majority agrees that Rule 30 was not followed but concludes that fairness requires review because the objection to the charge language in issue was raised at the charge conference, the trial court subsequently preserved all objections raised at the charge conference and our disapproval of this practice in *State v. Wheelock,* 158 Vt. 302, 306, 609 A.2d 972, 975 (1992), occurred only two weeks before the charge in this case. Rule 30 is explicit on the requirement of specific objections, and the grounds therefore, and on the timing of objections. *Wheelock* simply explained the obvious, that is, that the practice used here is contrary to the rule and contrary to the rationale of giving the trial court one last opportunity to correct error before the jury retires. See *id.* Thus, in *State v. Pelican,* 160 Vt. 536, 538, 632 A.2d 24, 26 (1993), we rejected the exact request for fairness sought here *in a case where the charge occurred prior to the Wheelock decision.* We are acting inconsistently here.

The majority's attempt to distinguish *Pelican* is unavailing. The relevant language of *Pelican* is:

> Defendant claims that his counsel's preservation method comported with practice prevailing at the time. We disagree. Our rule and case law required an objection following the instructions to preserve the issue for appeal. See *State v. Roberts,* 154 Vt. 59, 71, 574 A.2d 1248, 1253 (1990) ("'A claimed error in the jury instructions can be raised on appeal only if, after the delivery of the charge, the aggrieved party made a specific objection, including a clear statement of the matter to which he objects and the grounds of the objection.'") (quoting *State v. Lettieri,* 149 Vt. 340, 342, 543 A.2d 683, 685 (1988)).

*Id.* Defendant's inaction here is also at variance with what our rule and case law require.

Even if *Pelican* can be distinguished, the critical difference here is that the charge occurred after *Wheelock* was decided. In *State v. Shattuck*, 141 Vt. 523, 528-29, 450 A.2d 1122, 1124-25 (1982), we reviewed the options on when to make a new decisional rule effective. One of the options is *not* to make it effective at some time after the new decisional rule is announced, giving lawyers an opportunity to read the precedential decision. Indeed, we decided to adopt the common-law rule that new judicial decisions are partially retroactive in criminal cases. *Id.* at 529, 450 A.2d at 1125. It was that rule which *Pelican* implemented.

I recognize the difficulty of insisting that counsel follow the objection rule even though the trial judge specifically stated such an objection was unnecessary and the appellate issue was clearly before the trial court. Nevertheless, we must be the judge of whether appellate preservation occurred, and I believe we must require strict compliance with the rule. The appellate records we are receiving, including this one, demonstrate why strict compliance is necessary.

Even before the opening of trial, counsel began to discuss potential charge language, and the court began to circulate drafts of its charge. A ninety minute charge conference occurred on the day before the charge was given. In a relatively free-flowing discussion, both prosecution and defense counsel addressed a draft of the charge prepared by the trial judge. There was no attempt to separate formal objections from requests or preferences. There was no summary of positions at the end of the conference. Following an argument, defense counsel used statements like, "I would ask the court to reconsider or to consider that."

On the next morning, the court handed counsel the final charge and stated that prior objections were preserved. The deficiency in this practice is twofold: (1) the deficiency raised and excused by the majority that no objection was made at the correct time; and (2) the deficiency ignored by the majority and trial court that there never was any objection at all, certainly not one that stated distinctly the matter objected to and the grounds of objection. The trial court "preserved" only a free-flowing discussion of the law without *ever* requiring that the parties formalize positions in terms of objections. Cf. *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 138, 636 A.2d 744, 750 (1993) (similar civil rule is not followed with a "blanket objection to hundreds of pages of difficult-to-follow argument").

I am aware from the cases we have reviewed that some trial judges are following the practice used here and find it to be a thorough and efficient way to construct a charge. Our perspective is necessarily different. The best jury charge is nevertheless an imperfect attempt to explain complicated and often uncertain legal concepts to the lay jury. Charge conferences frequently become "brain-storming" sessions where virtually any possible position is offered. With the opportunity for reflection, and the benefit of hindsight, creative appellate counsel will find errors in language never seriously considered by the trial judge. Unless we are prepared to accept frequent reversals for errors in jury charge language, we must require that trial counsel itemize serious differences with the charge in a way that the trial judge will consider them. That requirement is contained in Rule 30 but was not followed here.

The majority has stated an additional reason for reaching its conclusion — that the charge was plain error. "Only in extraordinary cases will we find plain error." *State v. Johnson*, 158 Vt. 508, 514, 615 A.2d 132, 135 (1992). Under the charge, the jury could transfer Gundlah's intent to Bacon only if Gundlah's acts were "incidental to the execution of or as a natural and probable consequence of their original plan, and in furtherance of their alleged common purpose." Because of the requirement that Gundlah act in furtherance of the common purpose, this language goes beyond the *Orlandi* language which the majority criticizes. If the charge stated that mere participation in the burglary allowed Gundlah's intent to be transferred to Bacon, I might agree with the majority. Since the charge requires more, I would not find plain error.

I would, however, reverse and remand all of defendant's convictions because he was denied his Sixth Amendment right to assistance of counsel. The majority has described some of the facts bearing on this issue. The following is a supplement to the majority's recitation.

On December 27, 1991, the State moved for a pretrial ruling that the results of DNA analysis conducted by the State would be admissible at trial. The motion indicated that the analysis had shown a match between the murder victim's blood and blood stains found on defendant's down vest and blue jeans. It further found that the chance of an unrelated profile match for the stain on the vest was 115,000 to 1 and for the stain on the blue jeans was 26 to 1.

Evidentiary hearings were held on the motion to withdraw on January 14 and 22, 1992; and included evidence from a number of lawyers called by defendant. Trial counsel testified that he had agreed

to provide representation in the case on the understanding that it involved only the murder charge. When he learned of the full extent of the charges, he requested from the assigned counsel coordinator that he be allowed to bill, and get paid, periodically "to at least try to maintain some sort of economic viability within the office."[1] The coordinator agreed to this arrangement, but no payments were made on trial counsel's bills because the Office of Defender General ran out of money to pay ad hoc assigned counsel for the fiscal year (July 1, 1991 through June 30, 1992). Trial counsel felt that the State had breached its agreement with him and he was no longer acting voluntarily for defendant.[2]

Trial counsel asserted that defendant could not be given an adequate defense because "Every hour I give to him, I'm literally hurting myself and my family." He stated that this placed him in an inherent conflict of interest "where I have to decide whether my family and my law practice and my financial security is destroyed, or whether I adhere to my obligations to the client." He claimed not to be competent on the DNA admissibility issue. He estimated that he would have to expend about 500 hours of preparation on the question whether the DNA evidence was admissible.[3]

On February 25, 1992, the trial court issued an extensive opinion on the defense motions. The court found virtually all of the facts consistent with trial counsel's claims. It found:

> Compensation of assigned counsel should be adequate because the burden of a serious, complex case (such as this case), may create a situation where the cost of an attorney's office overhead places direct pressure upon him to reduce services to his client, thus breaching his duty of effective assistance. . . .

> [The State] agreed that when [counsel] reached $1,000 of chargeable time, a debenture would be submitted and if approved, [counsel] should be paid. However, the State has not fulfilled this agreement. . . .

---

[1] Although the record is vague on this point, it appears that trial counsel's firm contained two partners, including him, and two associates.

[2] Trial counsel also argued that the reimbursement rate of $25 per hour was "outrageous" and "a taking."

[3] The prosecutor estimated that based on the experience in other cases in Vermont, he would put between 100 and 150 hours into the DNA admissibility issue.

[The current reimbursement] rate of $25.00 per hour is inadequate to meet an *ad hoc* attorney's overhead, absent the attorney working out of his own home. . . .

[E]stimate seems well taken that a first degree murder case . . . may well involve between 500 and 1,000 hours of work and this constitutes one-third to two-thirds of an attorney's annual productive year.

The court denied the motions after a lengthy analysis of the right to counsel, the professional and ethical responsibilities of counsel, and the State's obligations under the United States and Vermont Constitutions and the Vermont Public Defender Act. It ordered, however, that trial counsel obtain approval for defense expenses and submit vouchers for these expenses. It ordered that these vouchers be paid no later than thirty days after submission. With respect to compensating trial counsel's time, the court ordered him to submit a debenture for all uncompensated time. It further ordered:

Completion of this process by a check in payment of such sums allowed should be received by Mr. Lawlor not more than 30 days after the date of submission. Prompt payment is necessary for the financial responsibility of his law office, and the discharge of his statutory obligations to pay staff in a timely fashion. . . . It hardly becomes a system of justice to call upon its attorneys to defend persons charged with serious crime to the extent that we convert the attorney into an outlaw.

(Citations omitted.)[4] Trial counsel's motion to take an interlocutory appeal from this order was denied.

For reasons not appearing in the record, the court's order was not followed. On the first day of trial in April, trial counsel had still not been paid any amount for his time.

Following this order, a skirmish occurred over payment for a defense DNA expert. Trial counsel contacted potential experts and obtained a price quote from one. The assigned counsel coordinator refused to pay the expert's rate and made a counteroffer. The expert refused to work for the counteroffer price. On defendant's motion, the court ordered the State to pay the expert's requested price. By this time, the expert had refused to provide the services, and trial counsel

---

[4] The court also requested that trial counsel file a copy of his debentures with the court. The file does contain a copy of debentures.

was unable to locate another expert. Defendant moved that the DNA evidence be excluded because the payment controversy had made it impossible for defendant to effectively contest the issue.

A hearing on the defense motion occurred on March 17, 1992. Trial counsel insisted he was not competent to contest DNA admissibility and it would not be "fruitful" for him to participate in the DNA admissibility hearing. In response, the prosecutor commented that defense counsel had failed to depose the State's DNA witnesses and added "I don't know how I'm going to meet an ineffective assistance claim with regard to that."

The hearing on DNA admissibility occurred on March 30, 1992. Two expert witnesses testified for the State. Defense counsel neither cross-examined the experts nor offered a memorandum in opposition to admission. On April 2, 1992, the court ruled the DNA testimony was admissible based on the foundation testimony of the State's experts. Not surprisingly in light of the one-sided record, defendant has not challenged this ruling on appeal.

Trial began on April 6, 1992 but only after another major skirmish over the issue of defendant's representation. A letter from the trial judge to his law clerk was placed in the file by mistake and obtained by a newspaper reporter. The newspaper article stated that the trial judge was "tending to agree" with the prosecutor that trial counsel was trying to make a record of ineffective assistance of counsel and that the judge was "about ready to tell [trial counsel] . . . he has exceeded professional limits." The article also stated that the judge found trial counsel's "carping about inability to hire a DNA expert to be pretty unbearable." The trial judge was interviewed and noted that he had ruled that trial counsel had to serve "regardless of economic hardship." The newspaper story also noted that trial counsel had showed up ninety minutes late for a hearing during the preceding week and explained his conduct as "incompetence, sheer incompetence."

Following the story's publication, trial counsel moved to recuse the trial judge, a motion that was referred by the trial judge to the Trial Court Administrative Judge and denied after a telephone hearing. The hearing replayed the issue of trial counsel's representation, and he reiterated that defendant could not be adequately defended because of lack of resources, and added, "Sometimes the hardest thing in the world to do is sit and do nothing and let a system demonstrate its own failures."

I have detailed the facts to emphasize that this is an extreme case. It involves one of the most notorious and serious crimes ever to occur

in Vermont. The number of counts and the complexity of the legal issues, including the unresolved issue in Vermont of the admissibility of DNA evidence and probability calculations, made it an exceptionally difficult and time-consuming case to defend. As the trial court found, defense of the case could consume between one-third and two-thirds of a lawyer's annual billable hours. As the court also found, trial counsel's economic constraints were identified at the beginning of the representation and were not contested. Trial counsel was misled, however, into taking on this case, first by the nondisclosure of the multiple felony counts and then by the promise of a payment arrangement that could not be honored. When he found that he could not provide the needed defense consistent with the economic demands of his small firm, trial counsel sought to withdraw and ended up in a protracted battle with the trial judge over his ethical obligations. Although the court privately believed that trial counsel was intentionally failing to provide an adequate defense in order that a conviction could not stand, it refused to allow the withdrawal. Trial counsel essentially stood mute on the major legal issue of the case, the admissibility and use of the DNA evidence.

Although defendant appeals the refusal to allow withdrawal of trial counsel, the State tries to characterize this as a standard ineffective-assistance-of-counsel claim, arguing that it is not sustainable procedurally or substantively. Procedurally, it argues that an ineffective-assistance-of-counsel claim cannot be raised on direct review of the conviction. See *In re Moskaluk*, 156 Vt. 294, 298, 591 A.2d 95, 97 (1991); *State v. Davignon*, 152 Vt. 209, 222, 565 A.2d 1301, 1308 (1989). Substantively, it argues that there was no showing trial counsel's actual performance fell below professional norms or that the result would have been different if counsel's performance had been adequate. See *In re Trombly*, 160 Vt. 215, 218, 627 A.2d 855, 856 (1993); *In re Hanson*, 160 Vt. 111, 114-15, 623 A.2d 466, 468 (1993).

This is, however, a case totally unlike those on which the State relies. In each of those cases, the error asserted was based on actions or inactions of counsel and not, as here, a ruling of the trial court. Further, in each of those cases, there was no preservation of the issue during trial; indeed, nonpreservation is very often a part of the performance alleged to be substandard. Here, the issue is fully and exhaustively preserved based on an extensive factual record.

There is, therefore, no procedural reason not to reach the counsel issue raised by defendant. The rule on which the State relies is based on the inadequacy of the record in ineffective-assistance-of-counsel

cases, see *Moskaluk*, 156 Vt. at 298, 591 A.2d at 97, a deficiency not present here. In fact, we have a preference for resolving issues on direct review, if possible, rather than going through the duplicative inquiry of a post-conviction relief proceeding. See *State v. McCarthy*, 156 Vt. 148, 158 n.2, 589 A.2d 869, 875 n.2 (1991). The question is fully preserved below. Cf. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980) (reviewing court cannot presume prejudice resulting from conflict-of-interest claim where claim not raised below).

The larger question is whether the denial of a motion to withdraw in such circumstances can be grounds for reversal of a criminal conviction in the absence of a showing of substandard performance that affected the outcome of the case. I agree with defendant that denial of the motion to withdraw can provide grounds for reversal where there is sufficient showing of a conflict of interest. In *Holloway v. Arkansas*, 435 U.S. 475, 484 (1978), the Supreme Court held that the failure to allow withdrawal of a lawyer representing multiple criminal defendants, because of a conflict of interest among them, constitutes a denial of assistance of counsel and grounds for reversal of the convictions of each defendant. The Court relied on the holding of *Glasser v. United States*, 315 U.S. 60, 70 (1942), that the "'"assistance of counsel" guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer should simultaneously represent conflicting interests.'" *Holloway*, 435 U.S. at 482 (quoting *Glasser*, 315 U.S. at 70). The Court held that where a defense attorney, engaged in the representation of multiple defendants, asserted to the court that a conflict of interest was present, the court had to remove the conflict or "take adequate steps to ascertain whether the risk was too remote to warrant separate counsel." *Id.* at 484. It went on to hold that reversal was the automatic result of the trial court's failure to resolve the potential conflict, and defendant need not show prejudice. *Id.* at 488.

I agree with defendant that the *Holloway* analysis can apply in a case like that before us. Our Code of Professional Responsibility recognizes not only conflicts of interest arising from representation of multiple clients, see DR 5-105(B), but also conflicts where the representation of a client is adversely affected by the lawyer's "financial . . . or personal interests." Code of Professional Responsibility DR 5-101(A). The Court stressed in *Holloway* that the "evil . . . is in what the advocate finds himself compelled to *refrain* from doing." *Holloway*, 435 U.S. at 490. Similarly, here the evil is what counsel fails to do for the client because economic realities greatly

limit availability of time for pretrial work. I see no difference in the effect on the client between the conflict of interest in *Holloway* and the conflict that existed here. See Margulies, *Resource Deprivation and the Right to Counsel*, 80 J. Crim. L. & Criminology 673, 706-07 (1989); Note, *The Breath of the Unfee'd Lawyer: Statutory Fee Limitations and Ineffective Assistance of Counsel in Capital Litigation*, 90 Mich. L. Rev. 626, 642-45 (1991).

Trial counsel relied on the conflict-of-interest theory in support of the motion to withdraw. He argued that a conflict existed because his personal and financial interests prevented the provision of adequate representation to this defendant. The trial court's findings show that it fully agreed with trial counsel's assertions except when it came to the remedy. Like the trial court in *Holloway*, it put itself in the position of recognizing the problem but refused to provide a remedy that protected *defendant's* interests.

The words of the Florida Supreme Court in resolving a dispute over fees for appointed criminal defense attorneys are critical here: "[W]e must focus upon the criminal defendant whose rights are often forgotten in the heat of this bitter dispute." *Makemson v. Martin County*, 491 So. 2d 1109, 1113 (Fla. 1986). The trial court engaged in an extensive analysis of the professional and ethical obligations of lawyers to honor court appointments in criminal cases irrespective of financial remuneration and concluded trial counsel had an obligation to serve in this case even if unpaid. To the extent defendant's interests are considered in this analysis, the court appears to view them as protected by the ethical obligation of the lawyer to handle the case diligently, competently and zealously. See Code of Professional Responsibility DR 6-101(A)(1), DR 6-101(A)(2), DR 7-101(A)(1); see also A.O. 4, § 2 (assigned counsel must represent interests of clients "to the full measure of their professional responsibility, without regard to the amount of their compensation, if any").

We ignore reality if we conclude that the existence of ethical obligations will by themselves ensure effective representation in the face of compelling and unavoidable economic pressures to the contrary. See *Jewell v. Maynard*, 383 S.E.2d 536, 547 (W. Va. 1989) ("[I]n order to avoid an unnecessary burden on lawyers that can create a conflict of interest with their clients, the legislature must create some mechanism for periodic compensation of lawyers as services are performed."). Indeed, the focus on ethics framed this case as a battle between counsel and the court, with the defendant's rights lost in that battle. If trial counsel acts unethically, we have remedies to address

this misconduct; one of these remedies is not to inflict this misconduct on a criminal defendant faced with life imprisonment.

As I read the majority decision, it does not disagree with any of this legal analysis. Instead, it rejects defendant's claim because trial counsel failed to show in detail the nature of his conflicting economic interest and because the court order resolved the conflict. Neither of these reasons withstand close inspection; a correct analysis requires a retrial because of the violation of defendant's right to counsel.

The majority's criticism of trial counsel for failing to detail the precise extent of economic hardship to his law firm or his family and for failing to specify exactly how he was reducing services to defendant because of the lack of payment and the low rate of compensation reminds me of the Arkansas Supreme Court decision overturned in *Holloway*. As the United States Supreme Court summarized, the Arkansas Court "observed that [the public defender] had failed to outline to the trial court both the nature of the confidential information received from his clients and the manner in which knowledge of that information created conflicting loyalties. . . . [T]he court concluded that the record demonstrated no actual conflict of interests or prejudice to the petitioners, and therefore affirmed." 435 U.S. at 481. The United States Supreme Court rejected this requirement for a more detailed showing:

> It is arguable, perhaps, that defense counsel might have presented the requests for appointment of separate counsel more vigorously and in greater detail. As to the former, however, the trial court's responses hardly encouraged pursuit of the separate-counsel claim; and as to presenting the basis for that claim in more detail, defense counsel was confronted with a risk of violating, by more disclosure, his duty of confidentiality to his clients.

*Id.* at 485.[5]

As in *Holloway*, the majority's assertion that trial counsel should have presented the conflict "more vigorously and in greater detail" is

---

[5] The majority suggests a different standard is necessary to excuse the lack of a detailed showing of conflict of interest, that is — that the trial judge prevented such a showing. This standard takes out of context a description of the trial judge's actions contained in a footnote in *Holloway*. See 435 U.S. at 484 n.7. In fact, the standard announced by the Court was that the trial court had "to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel." *Id.* at 484. The Court used the trial judge's conduct to demonstrate that he could not have made such a finding at a specific hearing held in August 1975.

an ex post facto justification for a decision reached on entirely different grounds. The trial court never took that position. As he said succinctly to the newspaper, he ruled that trial counsel had to continue to provide representation irrespective of "economic hardship." The judge here, like the judge in *Holloway*, responded in a way that hardly encouraged pursuit of the motion to withdraw in more detail.

The trial court found that nonpayment of counsel hindered the defense. Although defense counsel testified in general terms, this was because there was no dispute about the relevant facts, and his claim was based on breach of an agreement constructed to meet counsel's economic needs. He presented his choice starkly — destruction of his law practice and financial security or adherence to his obligations to his client. The State never denied the choice was real, did not cross-examine defense counsel and did not take the position below that the motion should be denied for lack of precise proof. It has not taken that position here.

Much of the majority's new failure-of-proof theory is nit-picking. For example, the trial court found that the reimbursement rate was below the office overhead rate of all lawyers except those who work out of their home and that the defense of this case could be expected to consume between a third and two-thirds of trial counsel's billable hours for a year. Despite these findings, the majority faults trial counsel for not showing that the representation of defendant, for which he was not being paid, was causing cash-flow problems.

It would also have been inappropriate for trial counsel to provide much of the information the majority now seeks. The court and prosecutor were concerned that trial counsel was making a record of ineffective assistance of counsel, and the court was suggesting that trial counsel had already exceeded professional limits. Disclosures about how trial counsel was failing to provide a defense to his client would have been a breach of loyalty to the client and would have further impaired a relationship that must be based on trust and confidence.

Unlike the majority, I believe the handling of the DNA issue is very significant in showing the adverse effect on trial counsel's performance. Contrary to the majority's hindsight evaluation, the parties clearly believed that the DNA evidence would be of great importance and that DNA admissibility was the major legal issue of the case. DNA evidence was new to Vermont, and this Court had never ruled on its admissibility. In one instance where it had been offered in a

homicide case, the trial court excluded it because of unreliability of the probability results. See *State v. Passino*, 161 Vt. 515, 520, 640 A.2d 547, 549 (1994). This case occurred in May of 1991, just before defendant was charged in this case. Apparently, the defendant in *Passino* was able to keep out the DNA evidence without the benefit of his own experts. See *id.*

Despite the importance of the DNA issue, trial counsel here essentially gave up on it. He never cross-examined the expert witnesses called by the State in support of admissibility nor did he submit a memorandum of law arguing for exclusion. He had stated he was not "competent" to contest DNA admissibility, and even the prosecutor questioned how he was going to respond to an ineffective-assistance-of-counsel claim based on the admission of the DNA evidence. There could not have been a clearer demonstration of how the defense was impaired by the unwillingness or inability of trial counsel to proceed without being paid.

The majority's second factual reason for discounting the presence of a conflict of interest in this case is that the court ordered that trial counsel be paid. As the majority acknowledges, the record does not show trial counsel was ever paid prior to trial.[6] The record does reflect the submission of debentures as required by the court order. Indeed, the testimony of the assigned counsel coordinator was that trial counsel had submitted debentures to him, and they were unpaid.

The specific order that the majority finds sufficient requires that trial counsel's debentures be "paid by the Treasurer on warrant." The Treasurer was never made a party to these proceedings; nor was the Defender General, out of whose budget the payment would be made. Even the assigned counsel coordinator, who was ordered to send the debentures to the Commissioner of Finance, was not a party. I do not believe that the court order represented more than a hope that putting something on paper would achieve the desired result. As the trial judge said in the newspaper interview, the real order was that trial counsel had to serve regardless of economic hardship.

I also believe that the focus on the trial court's order shifts the analysis to the wrong party. We can speculate ad infinitum on what

---

[6] The majority cites to a statement by the prosecutor, made at the hearing on an interlocutory appeal motion, that $1,500 had been transferred by the Defender General to the Judiciary budget to pay a DNA expert and that showed compliance with the order to pay trial counsel's fees could be expected. In fact, the evidence was that money was available for expert witnesses but not for reimbursement of counsel. Thus, I do not see the relevance of the availability of expert witness money.

trial counsel could have done to pursue his economic interest, but the reality is that *defendant* was left with counsel who stated clearly that he could not provide proper representation under the prevailing circumstances. I believe the court's duty is to protect the defendant, whether or not trial counsel's economic interests are fully protected in the process.

If we accept that nonpayment of fees, or inadequate levels of compensation, can ever be grounds for denial of assistance of counsel if unaddressed, I believe this case clearly requires reversal. I emphasize again the factors that make this case extreme and extraordinary.

> (1) Counsel's assent to take the case was induced by an inadequate disclosure of its extent and then a broken promise to make periodic payments;

> (2) The reimbursement rate did not even cover counsel's office overhead. See statement accompanying 1993 Amendment to A.O. 4, § 6 (survey determined average hourly overhead rate in Vermont is $47 per hour).

> (3) Defendant was charged with first-degree murder and nineteen other crimes. Proper representation would take between one-third and two-thirds of counsel's annual billable hours. Cf. *Jewell v. Maynard*, 383 S.E.2d at 547 (no lawyer in West Virginia can be required to devote more than 10% of a normal work year to assigned counsel cases).

> (4) The court found that despite the low reimbursement rate lawyers were available to take major felony cases voluntarily.

> (5) The request to withdraw came early in the case before trial counsel had completed extensive pretrial preparation. It is not clear that the trial would have been delayed by a change of counsel.

As demonstrated above, defendant does not have to show prejudice under *Holloway*, but the record clearly shows it. I do not believe defendant received the assistance of counsel required by the Sixth Amendment. I would reverse and remand on that basis.